## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

JAMES A. BOLEY, JR., ADMINISTRATOR
OF THE ESTATE OF ROBERT LEE BOLEY,
DECEASED,

        Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH
SERVICES, INC.,

NURSESPRING, LLC,

ALVIN HARRIS, MD,

ARLEATHIA PECK, LPN,

CHARLETTE HAYES, LPN,

SERGEANT EMMANUEL BYNUM, and

OFFICER JOEL GUY,

        Defendants.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff James A. Boley, Jr., Administrator of the Estate of Robert Lee

Boley, deceased, by counsel, and moves this Court for judgment against Defendants Armor

Correctional Health Services, Inc. ("Armor"); NurseSpring, LLC ("NurseSpring"); Alvin Harris,

MD; Arleathia Peck, LPN; Charlette Hayes, LPN; Sergeant Emmanuel Bynum; and Officer Joel

Guy, stating as follows:

## I.      INTRODUCTION

1.      Robert Lee Boley ("Robert Boley" or "Robert") was left alone to die in his cell. The 48-year-old was rebuffed in his attempts to get access to medical care for his emergent condition from multiple nurses and guards at Deerfield Men's Work Center ("Work Center"), a correctional facility in Capron, Southampton County, Virginia.  Despite the desperate pleas of fellow inmates and his brothers, Robert Boley was told to wait until the next morning to see the doctor for chest pain and trouble breathing.  However, Robert Boley would die before a doctor, nurse practitioner, or any medical professional with the training to diagnose him came to see him.

## II.     JURISDICTION

2.      Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq*. (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq*. (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

## III.    VENUE

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

4.      Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    PARTIES

5.      Plaintiff JAMES A. BOLEY, JR., is, and was at all relevant times, a resident of the Commonwealth of Virginia. On October 8, 2019, James Boley duly qualified as Administrator of the Estate of Robert Lee Boley, Deceased, in the Southampton Circuit Court, under the applicable provisions of law.  A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**.  Plaintiff brings this action in his capacity as ADMINISTRATOR OF THE ESTATE OF ROBERT LEE BOLEY, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), and, alternatively, pursuant to Virginia Code § 8.01-25 *et seq*. (survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

6.      Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("Armor") is a corporation organized under the laws of the State of Florida with its principal office in Miami, Florida, and with operations in Virginia.  In particular, Armor has operations in the County of Southampton, Virginia at the Work Center, as well as at nine other locations in the Commonwealth.  Armor's designated agent for service of process is located in Henrico County, Virginia.  At, among other times, during Robert Boley's detention at the Work Center in April 2019 and continuing through his death on April 17, 2019, Armor had a contract with the Virginia Department of Corrections ("VDOC").  By contract, Armor assumed responsibility for the provision of on-site medical services to all inmates/detainees at the VDOC's correctional facilities, including Robert Boley at the Work Center.  Armor was paid in excess of $72 million per year to provide healthcare services at the VDOC's collective facilities, including the Work Center.  In its Budget, the VDOC states, "[t]he Medical Division's mission is to provide quality health care to all inmates."  For inmates who require treatment beyond the scope of the Medical

Division's practice, the Division "also coordinates with local hospitals and medical providers for inmates to be seen." Defendant Armor and its employees/agents, at all relevant times, provided services to the VDOC and its facilities as an independent contractor.

7.     Defendant ALVIN HARRIS, MD, is, and was at all relevant times, a physician licensed in the Commonwealth of Virginia. At all relevant times, Defendant Dr. Harris was an agent and/or employee of Defendant Armor working at the Work Center. As such, Defendant Dr. Harris had specific responsibilities and duties to provide for the medical care of Work Center inmates/detainees, including Robert Boley. Under reasonable information and belief, Defendant Dr. Harris was the Medical Director at the Work Center at all relevant times. At all relevant times, Defendant Dr. Harris was acting within the scope of his employment and/or agency with Armor and under color of state law.

8.     Defendant ARLEATHIA PECK, LPN, was, at all relevant times, a Licensed Practical Nurse working at the Work Center. At all relevant times, Defendant Peck, LPN was an agent and/or employee of Defendant Armor. As such, Defendant Peck, LPN had specific responsibilities and duties to provide for the medical/nursing care of Work Center inmates/detainees, including Robert Boley. At all relevant times, Defendant Peck, LPN was acting within the scope of her employment and/or agency with Armor and under color of state law.

9.     Defendant NURSESPRING, LLC ("NurseSpring") is a limited liability company registered in the Commonwealth of Virginia, with its principal office in Chesterfield County, Virginia, and operations in Virginia, South Carolina, and Florida. NurseSpring's designated agent for service of process in Virginia is located in Richmond, Virginia. At all relevant times hereto, Defendant NurseSpring served as a contractor to Defendant Armor. At all relevant times

4

hereto, as a contractor to Armor, NurseSpring supplied nursing and healthcare staff to Armor at locations where Armor was contracted to provide healthcare services, including the Work Center.

10.    Defendant CHARLETTE HAYES, LPN, was, at all relevant times, a Licensed Practical Nurse working at the Work Center.  At all relevant times, Defendant Hayes, LPN was an agent and/or employee of Defendant NurseSpring.  As such, Defendant Hayes, LPN had specific responsibilities and duties to provide for the medical/nursing care of Work Center inmates/detainees, including Robert Boley.  At all relevant times, Defendant Hayes, LPN was acting within the scope of her employment and/or agency with NurseSpring and under color of state law.

11.    Defendants Armor; Harris, MD; and Peck, LPN are collectively referred to herein as the "Armor Defendants."

12.    Defendants NurseSpring and Hayes, LPN are collectively referred to herein as the "NurseSpring Defendants."

13.    Defendant SERGEANT EMMANUEL BYNUM was, at all relevant times, an agent and/or employee of the Virginia Department of Corrections ("VDOC") working as a correctional officer with the rank of sergeant at the Work Center.  Bynum was serving as the watch commander for the Work Center on the night of April 16, 2019 through the morning of April 17, 2019.  At all relevant times, Defendant Bynum was acting within the scope of his employment and/or agency with VDOC and under color of state law.

14.    Defendant OFFICER JOEL GUY was, at all relevant times, an agent and/or employee of the VDOC working as a correctional officer at the Work Center, and specifically, in

Robert Boley's cell block.  At all relevant times, Defendant Guy was acting within the scope of his employment and/or agency with VDOC and under color of state law.

## V.   FACTS

15.   Robert Lee Boley ("Robert Boley" or "Robert") was pronounced dead at the Work Center at 6:10 a.m. on April 17, 2019.

16.   At the Work Center, the medical staff knew that Robert Boley suffered from chronic illness, including hypertension.

17.   Throughout the day on April 16, 2019, Robert Boley was complaining that his chest was hurting and seeking medical attention.  His complaints and requests continued through when he was told to go into his cell for count at night.  Multiple other inmates also sought help for Robert Boley throughout the day and night of April 16. But despite the efforts of Robert and other inmates on his behalf to get him medical assistance for extreme chest pain and trouble breathing, he was not sent out to the hospital.  Robert Boley never saw a doctor, nurse practitioner, physician's assistant, or other medical professional qualified to diagnose him or even to independently assess him. Nor was he sent to the VDOC medical center at the building next door.[1]

18.   Even when Plaintiff James Boley, who had been informed of his brother's illness, called the Work Center seeking to get Robert care, Robert Boley continued to be disregarded. Despite witnessing his severe and relentless pain, Defendants Nurse Hayes, Nurse Peck, Officer

---

[1] Robert Boley was incarcerated at the Deerfield Men's Work Center, located at 15172 Old Belfield Road, Capron, VA 23829.  Another Virginia Department of Corrections facility, the Deerfield Correctional Center ("DFCC"), is located nearby at 21360 Deerfield Drive, Capron, VA 23829.  The two facilities share the same warden.  While the Work Center had a relatively small medical clinic on site, a larger, more equipped and comprehensive medical center with more staff of varied skill levels was located in the DFCC building.

Guy, and Sergeant Bynum failed to obtain emergency care for Robert Boley.  While he was contacted and informed about Robert's severe condition on April 16, 2019, Defendant Dr. Harris never came in to see Robert Boley on April 16.  Nor did Dr. Harris see Robert the following morning before Robert was pronounced deceased.

### A.    Robert Boley Seeks Help But is Turned Away. He Later Collapses in Front of Medical

19.    A little after 9 a.m. on the morning of April 16, 2019, Robert Boley felt pains in his chest while in the prison recreation area.  Robert drank some water and then a soda. Still experiencing chest pains, he sought medical help for his condition.

20.    According to inmate witnesses, a nurse declined to see Robert.  A witness who wrote a letter to Robert Boley's family after his death identified the nurse as Defendant Nurse Peck.  Peck said that Robert could not be seen by Medical unless he filled out a request form and sent it in to sign up for a later sick call.  "Sick call" is the term used in prisons for advance-scheduled nursing clinic appointments; nurses see inmates who previously made requests for episodic, non-emergency care.  The nurses thereafter refer matters not covered by general nursing protocols to physicians for still later-scheduled doctor visits.  Sick call is not a mechanism for receipt of emergency care.  Notwithstanding that Robert Boley was in obvious severe pain and making complaints of chest pain, Nurse Peck turned him away without examining him or referring him to a provider.  Nurse Peck would leave the Work Center that day without doing anything to assist Robert Boley.

21.    Thereafter, Robert Boley collapsed in the hallway.  He lost consciousness. Correctional officers huddled around Robert and one officer must have called over to the Deerfield Correctional Center ("DFCC"), as Defendant Hayes, LPN, came over to the Work Center from the DFCC.

22. At 3:04 p.m. on April 16, 2019, Nurse Hayes noted that "offender has complaints of chest pain. MD Harris notified orders given for EKG [electrocardiogram]."  Hayes took Robert Boley's vital signs, recording them as: blood pressure 66/48, pulse 60 beats per minute, and oxygen saturation rate of 97%.

23. A blood pressure of 66/48 is dangerously low.  A pulse of 60 beats per minute is also low for someone with such a low blood pressure.  Such a low blood pressure and pulse, and after loss of consciousness as well and complaints of chest pains, establishes an emergency.

24. Further, Nurse Hayes reportedly responded to Robert Boley's abnormally low blood pressure by asking him did he "double up" on his hypertension medication, prescribed by the prison's medical providers.  Robert replied that no, he had just taken the normal amount. Robert asked Nurse Hayes if she could take him off the blood pressure medicine.  He asked if taking it had anything to do with his severe drop in blood pressure.  Hayes did not offer an explanation. Further, notwithstanding both the emergent nature of Robert Boley's condition and these reservations about it, Nurse Hayes did not call EMS.

25. Moreover, after he was informed of Robert Boley's serious condition described above, MD Harris did not order that EMS be called either.

26. In a subsequently recorded "Late entry" concerning events noted as having occurred at 3:10 p.m. on April 16, 2019 (time of recording is not listed), Nurse Hayes wrote: "Upon assessment offender alert and oriented 3x.  Questioned about any drug use.  Offender denied drug use of any kind putting emphasis on spice."

27. At 3:43 p.m., the EKG results came back as "Borderline Abnormal."

28. Defendant Hayes took Robert Boley's vital signs again, and recorded them as: blood pressure 109/77, pulse 74, respiration rate 18, oxygen saturation rate 97%.  Surprisingly,

according to Nurse Hayes's note, Robert's blood pressure and pulse had drastically improved in just 40 minutes with no medication having been administered. Nurse Hayes also noted that she had administered the EKG and that "MD notified of [the EKG] results."

29.     In response to Robert Boley's first gravely low blood pressure and pulse, now unexplained reported higher blood pressure and pulse, and borderline abnormal EKG with complaints of chest pains and passing out, Dr. Harris did not order Robert Boley to be sent to the hospital.  Dr. Harris did not come and examine Robert or arrange for another doctor or similar provider (nurse practitioner or physician's assistant) to do so.  Instead, Dr. Harris ordered that Nurse Hayes give 30 ml "stat and prn [as needed every] 2 hours" of a medication that is partially illegible.  However, Plaintiff believes, based on inmate witness reports and Robert Boley's own statements in recorded phone calls, that it was an indigestion medication, either Geri-Lanta, Pepto Bismol, or Maloxx.  An indigestion medication would not have treated Robert Boley's chest pain.  Nurse Hayes also wrote that the doctor would not come to see Robert until at least the next day: "Offender referred to MD 4/17/19."  Nurse Hayes further told Robert not to take his next dose of blood pressure medicine, but to wait until he saw the doctor.  No orders for nursing monitoring of Robert Boley or transfer of him to medical housing were recorded. Robert's condition was an emergency and could not wait for a routine doctor's visit.  He would die without Dr. Harris attempting to see him.  Robert Boley was returned to his housing unit, his chest pain unresolved.

**B.     At or about 5:00 p.m. on April 16, 2019, Robert Boley sat down in front of the master control booth to get medical attention.**

30.     According to multiple inmate witnesses who were with Robert Boley, he was continuing to experience extreme chest pain on the afternoon of April 16, 2019 in his housing unit.  Robert Boley was keeping his movements to a minimum to try to conserve his energy.

Robert sought help from officers, including Defendant Officer Guy, but was disregarded.  Robert Boley went to sit down in front of the master control booth, which is where the officer in charge of allowing inmates in and out of the unit sits.  Upon information and belief, the officer in charge of egress and ingress on April 16 and into the morning of April 17 was Officer Guy.  According to fellow inmates, Robert sat down directly in front of the booth in an effort to encourage officers to provide him with access to medical care.  Those inmates further report that Robert was asking for assistance from any prison or medical care staff near him.

31.     Robert Boley's efforts were finally successful.  Per a subsequent report, Sergeant Bynum wrote that he was informed "during a briefing with Lieutenant A. Jones" that Robert "was not feeling well."  Bynum further wrote that Robert "wanted to see a Nurse."  Bynum wrote that he called over to the Deerfield Correctional Center to ask for a nurse to come see Robert.

32.     At 6:52 p.m. on April 16, 2019, Nurse Hayes took Robert Boley's vital signs again—blood pressure 114/84, pulse 80, respiratory rate 18, temperature 98.2 °F, oxygen saturation 99%.  The note by Defendant Hayes—the same nurse who saw Robert earlier that afternoon after he collapsed—states, "Offender still has slight discomfort, vitals returning to baseline, second dose [illegible indigestion medication] administered 30 ml [milliliters]."

33.     Nurse Hayes characterized Robert Boley's continuing pain as "slight discomfort." However, in a recorded phone call from just prior to this encounter at 6:31 p.m., Robert explained how he was given indigestion medication earlier and told to call for Medical again if two hours went by and "nothing happens."  He described he was then currently waiting to try to get access to Medical again because nothing had happened; his condition had not improved. Robert said, "I'm like shit man, that shit ain't – I ain't never felt that shit man."  Robert gave the

number to the prison to the friend with whom he was speaking.  He asked the friend to contact

his brother James.  The two discussed calling into the prison on Robert's behalf.  The friend

remarked on how Robert's condition was serious.  These reports, combined with his recorded

complaints of pain before and after this meeting with Defendant Hayes, make it very unlikely

that Robert Boley only complained of "slight discomfort" to Nurse Hayes.  Further, Robert's

condition was so extreme that other inmates tried to get word of Robert's illness to his brother

James Boley, as described below.

34.    Nurse Hayes did not report Robert Boley's continued pained condition to Dr.

Harris.  Notwithstanding that Dr. Harris's medication order said to give the medication "prn [as

needed every] 2 hours," there is no indication this was done or even offered after 6:52 p.m. on

April 16, 2019.  Robert was not seen thereafter by Hayes or any other medical professional until

he was found unresponsive the following morning.  Robert and other inmates on his behalf

continued to seek medical attention for him, but they were disregarded.

    **C.**    **Robert Boley and other inmates on his behalf continued to seek medical
attention throughout the evening and night of April 16, 2019 to no avail.**

35.    Robert Boley was in extreme pain and struggling to breathe on the evening of

April 16, 2019.

36.    According to an inmate witness who wrote letters to Robert Boley's family after

his death, Robert Boley had been repeatedly complaining and asking for help and attention for

his chest pain.  The witness also wrote that during the evening and into the night of April 16,

2019, several inmates "asked the officer Mr. Guy could they please go check on [Robert] Boley."

Per that witness, Officer Guy's "reply was that he was ok and he would check on [Robert] Boley

himself."  That witness saw Officer Guy go to Robert Boley's room only once at 9:15 p.m.

Officer Guy went into Robert's room for "no more than 2 minutes."  When he passed the inmate

witness after coming out, Officer Guy "just shook his head" and moved on.  Guy did not provide Robert Boley with access to medical care.

37.     Robert, and the other inmates on his behalf, were desperate to get him to a hospital.  However, due to the deliberate indifference of Defendants Dr. Harris, Nurse Hayes, Nurse Peck, Sergeant Bynum, and Officer Guy, Robert would never be taken to the hospital.

38.     Robert Boley's condition was so dire, and Defendants so dismissive of his suffering, that, according to an inmate witness, other inmates contacted people outside the Work Center to try to get in contact with Plaintiff James Boley, Robert Boley's brother.

39.     James Boley was informed that Robert was having serious chest pains. Upon hearing that his brother was so sick, James immediately called the Work Center.  James spoke with a Sergeant, upon information and belief Sergeant Bynum.  James entreated Bynum that if his brother was complaining of chest pains, such a condition was serious.  James said that his brother needed to go to the hospital, or, at the very least, to the medical center at Deerfield Correctional Center.  Sergeant Bynum responded to this plea from James Boley about his brother's dire condition with disregard; Bynum said, "he'll be alright," or words to that effect. Distressed, James continued trying to convince Bynum to act to help Robert.  Bynum eventually said he would follow through with James Boley's request to have Robert call home to James.

40.     Michael Boley, James and Robert Boley's brother, also called the Work Center multiple times trying to gain assistance for Robert.

41.     Each time that Michael Boley called the prison, he was told that his brother Robert was okay and to stop calling, that the Sergeant, upon information and belief, Sergeant Bynum, would handle the issue.  After multiple calls, the Sergeant began to address Michael in a nasty tone and simply repeated that Robert was okay.  Michael ended his last call with the

Sergeant by asking the Sergeant not to let Michael receive a phone call informing him that his brother had died.  Sadly, Michael would shortly thereafter get that call from his brother James informing him that their brother Robert had died.

**D**.      **After Robert Boley's death, Sergeant Bynum recorded a late entry stating that he saw Robert on the night of April 16, 2019.  Officer Guy also acknowledged seeing Robert Boley that night.**

42.      At 12:21 p.m. on April 17, 2019, almost seven (7) hours after Robert Boley's body was discovered, Sergeant Bynum recorded an entry indicating that he had interacted with Robert Boley at approximately 9:25 p.m. on April 16.  In his late entry, Bynum writes that at approximately 9:10 p.m. on April 16, 2019,[2] he received a phone call from Robert Boley's brother, James Boley.

43.      During his call with Bynum, described above, James Boley said he had heard that Robert was sick, suffering from chest pains, and needed to go out to the hospital.  After Bynum declined to assist Robert, the desperate James Boley finally convinced Bynum to at least ask Robert to call home.  However, in his late-recorded note, Sergeant Bynum merely described James asking Bynum to have Robert call home.  Bynum did not describe his insistence that the now deceased Robert would "be alright" or words to that effect, nor his declining to summon medical help.  Bynum wrote that he told James that he would have Robert phone home and then summoned Robert to the Watch Office, where Sergeant Bynum was stationed.

44.      According to Sergeant Bynum's late entry, once Robert arrived at the Watch Office at about 9:25 p.m., Bynum asked Robert "how he was feeling, and he stated that he was

---

[2] Bynum's entry states "04172019," but Plaintiff believes this is a typographical error. Robert Boley was deceased well before 9:10 p.m. on April 17, 2019.

sleepy." Bynum reportedly told Robert to call home and Robert said he would. Sergeant Bynum further wrote that Robert "preceded (sic) to ask questions about the effects of Heartburn."

45.    For his part, Defendant Officer Guy also made a report after Robert Boley's death in which he described that he had been asked by Sergeant Bynum to send Robert Boley to the Watch Office "around 9:15 to 9:30 PM" on April 16.

46.    Sergeant Bynum's after-the-fact description of the interaction between himself and Robert conflicts with inmate witness statements about Robert's repeated chest pain and trouble breathing, his repeated requests for medical help, and other inmates' perception of his medical need as open and obvious. Sergeant Bynum also did not file the late report until after he knew Robert Boley had died.

47.    At approximately 9:25 p.m. on April 16 in the Watch Office – and just prior to that in transition to the Watch Office –  when Sergeant Bynum and Officer Guy respectively reported seeing Robert Boley, Robert was a direly ill man. But, neither Guy nor Bynum did anything to help Robert. Robert had collapsed at least once earlier that day. Robert's obvious pain and struggles to breathe had long been apparent even to other inmates. Bynum knew that Robert's condition was dire enough for James and Michael Boley to have been contacted about it and to call on their brother's behalf. Guy knew that other inmates had raised concerns with him about Robert and that Robert himself had asked for help. Bynum had also been informed that Robert was suffering from chest pains. Despite their knowledge of Robert's critical state and Robert's condition being openly severe, Sergeant Bynum and Officer Guy did not help Robert. Robert was just sent back to his room after the Watch Office encounter.

48.    Additionally, by that time in the evening, Robert had been trying to get medical assistance to resolve his ongoing chest pains and trouble breathing for hours. Robert, and

inmates on his behalf, had pled for Robert to receive care.  Robert had asked for medical help

multiple times, even sitting on the floor in front of master control to appeal to officers.  Robert's

interactions with medical staff had not resulted in any diagnosis or resolution of his condition;

irregularities in his vital signs and EKG had been disregarded and he had been given medicine

for indigestion, but nothing for his chest pain or trouble breathing, even when his pain persisted.

He continued to suffer and would soon be dead.  It strains credulity to accept that Robert would

have said only that he was sleepy when asked by Sergeant Bynum how he was feeling.  It is far

more likely that Robert did complain of chest pain and trouble breathing to Bynum – and to Guy

– but that these officers took no action despite those complaints.

        49.     Back in his housing area, Robert Boley did call his brother James at or about 9:46

pm.  During that conversation, which was recorded on the prison phone system, Robert reported

feeling "f---ed up," indicating the area "like in the middle – you know how you rub your thumb

through the line in your chest."  He reported having trouble keeping food down and having no

appetite.  Robert described feeling something abnormal in his chest since that morning.  He

expressed concern that the condition had been going on for so long.  He described being initially

rebuffed in his requests for medical care, and feeling light-headed or like he was dozing off.

Robert said he eventually saw a nurse and was given only ingestion medicine; he recounted

being asked did he "double up" on his blood pressure medicine and being told not to take it again

until he eventually saw the doctor. Robert reported how his condition continued thereafter, not

having improved.  Robert described his condition as "bust[ing] you down like that man."  Robert

also indicated that he was wary of going to sleep that night, given the state of his health.  This

would be the last time that Robert and James Boley would speak.

50.     According to an inmate housed with Robert Boley, after speaking with his brother James, Robert once again asked Officer Guy if he could see a nurse.  After being rebuffed by Officer Guy once again, Robert Boley went back into his cell to lie down.  No inmates saw him again until he was found during the count the next morning.

**E.     On the morning of April 17, 2019, Robert Boley was found unresponsive in his cell.**

51.     Per inmate witnesses and her own report, Officer Jones, while performing the 5:30 a.m. count, found Robert Boley unresponsive and not breathing.  She screamed to get Officer Guy's attention.  According to an inmate witness who wrote a letter to Robert Boley's family after his death, Defendant Guy "was afraid to call the Code and gave his radio to the female officer and asked her to call in the code."

52.     At 5:44 a.m., Nurse Phillip,  Olisah, LPN, and Turner, CNA, responded to the scene.

53.     At 6:10 a.m. on April 17, 2019, Robert Lee Boley was pronounced dead.  Nurse Vaughan communicated the pronouncement at the direction of Dr. Yancey, whom Vaughan had reached on the phone.

54.     At 9:20 a.m., Dr. Harris wrote that "Pt found unresponsive in cell earlier this am and pronounced dead via Dr. Yancey per phone."  That was the only entry that Defendant Harris made about Robert Boley for the period from April 16-April 17, 2019.

55.     The Office of the Chief Medical Examiner ("OCME") determined on autopsy that Robert Boley died of a "ruptured aortic aneurysm due to hypertensive and atherosclerotic cardiovascular disease."  The medical examiner noted that "[p]ostmortem toxicology screening by the Department of Forensic Science was negative."

16

VI.    **DEFENDANTS OWED ROBERT BOLEY DUTIES; DEFENDANTS BREACHED THEIR DUTIES CAUSING ROBERT BOLEY'S DEATH**

A.    **Defendants owed duties to Robert Boley**

56.    At all times while Robert Boley was confined/detained at the Work Center, he was in the custody and under the care of the Defendants, and other employees/agents of VDOC, Armor, and NurseSpring.

57.    As discussed herein, the Defendants owed duties to Robert Boley.  Among these duties, Defendants, and each of them, had statutory and common law duties of care to Robert, including affirmative duties to provide adequate, safe, secure, and humane conditions of detention/confinement, including adequate medical care or access to adequate medical care.

58.    Defendants and their agents and employees had specific statutory duties to provide, or provide access to, medical treatment to Robert Boley under Va. Code § 53.1-32. Under that statute, the Defendants had a specific responsibility to inmates to "provide… medical and mental health care and treatment." *Id*.  Further, the Virginia Legislature has provided that, "[i]n no event shall any prisoner be denied medically necessary service due to his inability to pay." *Id*.

59.    All Defendants owed duties to Robert Boley to exercise reasonable care in providing him, and/or in providing him timely access to, medical care, nursing care, professional, and/or correctional services during the time period of his incarceration under the Virginia Department of Corrections.

60.    The Armor Defendants and NurseSpring Defendants further had duties to render that degree of knowledge, skill, diligence, and care to Robert Boley that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

61.     Defendants Armor and NurseSpring are accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of their employees and agents, including, but not limited to, those who are Defendants hereto.

**B.     Defendants breached duties owed to Robert Boley; Defendants' conduct and omissions violated clearly established statutory, constitutional, and common law rights of which Defendants knew.**

62.     Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Robert Boley, and were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent to Robert's care and needs.

63.     In disregard of the many requests by Robert Boley, and inmates on his behalf, and the duties and responsibilities of the Defendants, Robert Boley was denied access to and provision of adequate medical care.

64.     The Armor Defendants and NurseSpring Defendants were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent when they disregarded Robert Boley's serious medical condition.  The foregoing Defendants failed to respond or responded in a negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent fashion, to Robert Boley's harmful medical condition. Robert died as a result.

65.     Defendant Guy was grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent when he disregarded Robert Boley's serious medical condition and pleas for help made by him and other inmates.  Defendant Guy failed to respond or responded in a grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent fashion to

Robert Boley's harmful medical condition that was apparent to other inmates. Robert died as a result.

66.     Defendant Bynum was grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent when he disregarded Robert Boley's serious medical condition and pleas for help made by Robert Boley's brothers.  Upon information and belief, Sergeant Bynum is the one Michael Boley spoke to about his brother.  Defendant Bynum failed to respond or responded in a grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent fashion to Robert Boley's harmful medical condition that was apparent to other inmates. Robert died as a result.

67.     Robert Boley's constitutional rights were violated by Defendants Harris, Peck, Hayes, Bynum, and Guy through the delay, denial, and/or withholding of medical care.

68.     The Defendants' negligence, gross negligence, willful and wanton negligence, and/or deliberate indifference to Robert Boley's acute medical needs caused his death.  Had the Defendants timely and properly intervened, Robert Boley would not have died.

(The following counts are asserted cumulatively, or in the alternative, individually.)

VII.    COUNTS

## COUNT I

## NEGLIGENCE

### (Against Defendants Armor, NurseSpring, Harris, Peck, and Hayes)

69.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

70.     Defendants Armor, NurseSpring, Harris, Peck, and Hayes (the "Foregoing Defendants," in this count only) had, as discussed above and among other duties, duties to

exercise reasonable care with regard to Robert Boley.  The Foregoing Defendants had, among other duties, duties to provide prompt medical care for Robert Boley's acute and obviously serious condition.

71.     The Foregoing Defendants owed duties to Robert Boley to render that degree of knowledge, skill, diligence and care to Robert that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

72.     However, as described throughout this Complaint, the Foregoing Defendants breached their duties to Robert Boley and these breaches constituted negligence.

73.     Under the doctrine of *respondeat superior*, Defendants Armor and NurseSpring are legally responsible for the actions and inactions of their employees, Defendants Harris, Peck, and Hayes, which were performed in the scope of their employment/duties with Armor and/or NurseSpring.

74.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, Robert Boley suffered great physical pain, injury, and mental anguish.

75.     As a direct and proximate result of the negligence of the Foregoing Defendants, Robert Boley died.

76.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b)     Loss of services, protection, care, and assistance provided by the decedent.

77.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Estate of Robert Boley sustained damages, including, but not limited to:

        a)     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

        b)     Reasonable funeral expenses.

78.     The Foregoing Defendants' negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

**COUNT II**

**GROSS NEGLIGENCE**

**(Against all Defendants)**

79.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

80.     Defendants Armor, NurseSpring, Harris, Peck, Hayes, Bynum, and Guy (the "Foregoing Defendants," in this count only) had, as discussed above and among other duties, affirmative duties to provide Robert Boley adequate, safe, secure, and humane conditions of detention/ confinement, including adequate medical care or access to adequate medical care.  All Defendants also owed duties to Robert Boley to exercise reasonable care in providing him, and/or in providing him timely access to, medical care, nursing care, professional, and/or correctional services during the time period of his incarceration.

81.     The Armor Defendants and NurseSpring Defendants further had duties to render that degree of knowledge, skill, diligence and care to Robert Boley that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

82.     Under the doctrine of *respondeat superior*, Defendants Armor and NurseSpring are legally responsible for the actions and inactions of their employees, Defendants Harris, Peck, and Hayes, which were performed in the scope of their employment/duties with Armor and/or NurseSpring.

83.     The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Robert Boley so as to constitute an utter disregard of prudence, amounting to a complete neglect for Robert's safety.  Additionally, as to each individual Defendant, his/her several acts of negligence, when combined, had the cumulative effect of showing a reckless or total disregard for Robert Boley.

84.     As a direct and proximate cause of the gross negligence of the Defendants, which contributed to and was the proximate cause of the death herein complained of, Robert Boley suffered great physical pain, injury, and mental anguish.

85.     As a direct and proximate result of the gross negligence of the Foregoing Defendants, Robert Boley died.

86.     As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b)     Loss of services, protection, care, and assistance provided by the decedent.

87.     As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Estate of Robert Boley sustained damages, including, but not limited to:

        a)      Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

        b)      Reasonable funeral expenses.

88.     The Foregoing Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT III

## WILLFUL AND WANTON NEGLIGENCE

### (Against all Defendants)

89.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

90.     Defendants Armor, NurseSpring, Harris, Peck, Hayes, Bynum, and Guy (the "Foregoing Defendants," in this count only) had, as discussed above and among other duties, affirmative duties to provide Robert Boley adequate, safe, secure, and humane conditions of detention/ confinement, including adequate medical care or access to adequate medical care.  All Defendants also owed duties to Robert Boley to exercise reasonable care in providing him, and/or in providing him timely access to, medical care, nursing care, professional, and/or correctional services during the time period of his incarceration.

91.     The Armor Defendants and NurseSpring Defendants further had duties to render that degree of knowledge, skill, diligence, and care to Robert Boley that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

23

92.     Under the doctrine of *respondeat superior*, Defendants Armor and NurseSpring are legally responsible for the actions and inactions of their employees, Defendants Harris, Peck, and Hayes, which were performed in the scope of their employment/duties with Armor and/or NurseSpring.

93.     The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard of Robert Boley's rights.  In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Robert Boley when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would likely result in injury to Robert Boley.

94.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, Robert Boley suffered great physical pain, injury, and mental anguish.

95.     As a direct and proximate result of the willful and wanton negligence of the Foregoing Defendants, Robert Boley died.

96.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

        a)      Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

        b)      Loss of services, protection, care, and assistance provided by the decedent.

24

97.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Robert Boley's injuries and death, the Estate of Robert Boley sustained damages, including, but not limited to:

a)      Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

b)      Reasonable funeral expenses.

98.     The Foregoing Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

99.     Also, the foregoing willful and wanton negligence claim supports, and Plaintiff seeks, the imposition of punitive damages.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS –
### EIGHTH AND FOURTEENTH AMENDMENTS / 42 U.S.C. § 1983

### (DENIAL, DELAY, AND WITHHOLDING OF MEDICAL CARE)
### (Against Defendants Harris, Peck, Hayes, Bynum, and Guy)

100.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.    At all times relevant to the allegations in this Complaint, Defendants Harris, Peck, Hayes, Bynum, and Guy (the "Foregoing Defendants," in this count only), acted or failed to act under color of state law.

102.    The Eighth and Fourteenth Amendments to  the  United States Constitution protect inmates from cruel and unusual punishment and affords to inmates the right to receive treatment for serious medical needs.  As described in the Complaint, the Foregoing Defendants

failed to provide access to necessary medical care, to include medical treatment, in response to obvious, serious medical needs.

103.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Robert Boley's health and safety, thereby placing Robert in substantial risk of serious harm.

104.    At numerous times throughout the course of his confinement, the Foregoing Defendants knew from Robert Boley himself, his brothers, other inmates acting on his behalf, and/or his open and obvious condition, that Robert Boley had serious medical needs that were not being met.  Despite such knowledge, the Foregoing Defendants failed to reasonably respond.

105.    The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

106.    As a direct and proximate result of the Foregoing Defendants' conduct, Robert Boley was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and protected under 42 U.S.C. §1983.

107.    As a direct and proximate result of the Foregoing Defendants' conduct, Robert Boley died.  Robert Boley's death constitutes a deprivation of his constitutional rights guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and protected under 42 U.S.C. §1983.

108.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Robert Boley's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

109.    The Foregoing Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate of Robert Boley.

## VIII.  JURY TRIAL DEMANDED

110.    Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Armor; NurseSpring; Harris, MD; Peck, LPN; Hayes, LPN; Sergeant Bynum; and Officer Guy, jointly and severally, in the amount of $10,000,000, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees (in connection with the federal civil rights claims), punitive damages in an amount to be determined at trial in connection with the federal claims and the state willful and wanton negligence claims asserted herein, and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

JAMES A. BOLEY, JR., ADMINISTRATOR
OF THE ESTATE OF ROBERT LEE BOLEY,
DECEASED


By:___/s/ Mark J. Krudys_____
            Counsel


Mark J. Krudys (VSB# 30718)
Daniel Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
Web:   www.krudys.com

*Counsel for Plaintiff James A. Boley, Jr.,*
*Administrator of the Estate of Robert Lee Boley,*
*Deceased*