IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JAMES A. BOLEY, JR., *Administrator of*  )
*the Estate of Robert Lee Boley*,          )
                                  )
     Plaintiff,           )
                                  )
       v.             )          Civil Action No. 2:21CV197 (RCY)
                                  )
ARMOR CORRECTIONAL HEALTH    )
SERVICES, INC., *et al.,*         )
                                  )
     Defendants.        )
                                  )

**MEMORANDUM OPINION**

This matter is before the Court on Defendants Armor Correctional Health Services, Inc.,

Alvin Harris, M.D., and Arleathia Peck, LPN's Motion for Summary Judgment (ECF No. 57).

The motion has been briefed, and the Court dispenses with oral argument because the facts and

legal contentions are adequately presented in the materials before the Court, and oral argument

would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated herein,

the Court denies Summary Judgment to Armor Correctional Health Services, Inc., Alvin Harris,

M.D., and Arleathia Peck, LPN on all Counts of the Complaint (ECF No. 1).[1]

---

[1] Plaintiff does not pursue direct liability against Armor Correctional Health Services, Inc.  Counts One through Four of the Indictment against Armor are based solely on vicarious liability.  In Virginia, claims for vicarious liability under the doctrine of respondeat superior and claims for direct liability against an employer are distinct.  *Parker v. Carilion Clinic*, 819 S.E.2d 809, 823-24 (Va. 2018).  An employer can be vicariously liable for the tortious acts of its employee, provided that the employee was performing the employer's business and acting within the scope of his employment at the time. *Id.* at 819 (*citing Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)). As such, the Court denies Summary Judgment to Armor Correctional Health Services, Inc. based on their vicarious liability.

## I. FACTS

On the morning of April 16, 2019, Robert Boley ("Boley") began to experience chest pains while in the Deerfield Men's Work Center ("Men's Work Center") recreation area.  (Mem. Supp. Summ. J. 2, ECF No. 58; Mem. Opp'n Summ. J. 1, ECF No. 83.)  According to witness David Lee Copeland, a fellow inmate, Boley sought out Nurse Arleathia Peck ("Nurse Peck") and asked to be seen for his chest pains.  Nurse Peck, who was the nurse on duty at the Men's Work Center, instructed Boley to fill out a request form and "send it to sign up for sick call."  (Mem. Supp. Summ. J. 8; *see also* Copeland Letter 1-2, ECF No. 58-7.)  In the Men's Work Center, all non-emergent medical care is provided through the sick call system, and patients are typically seen the following day for all but serious medical challenges.  (Mem. Supp. Summ. J. 6; Mem. Opp'n Summ. J. 4.)  The seriousness of the complaint is determined based on a nurse's discretion.  (*Id*.)

On a call with his brother James that same day, Boley described "chasing down the nurse" who gave him "the brush off game" shortly before an officer called for another nurse to examine Boley.  (Mem. Opp'n Summ. J. 5; Copeland Tr. 144:4-145:10, ECF No. 85-2.)  Nurse Peck does not recall these interactions with Boley, but she acknowledges that she was the sole nurse on call between the hours of 6:00 a.m. and 2:30 p.m. on the day in question.  (Mem. Supp. Summ. J. 6; Peck Dep. 24:4-20, 36:16-21, 78:11-15, 107:8-14, ECF No. 58-3.)  Nurse Peck clocked out of work around 2:40 p.m.  (Mem. Supp. Summ. J. 1; Mem. Opp'n Summ. J. 7.)

At or around 2:48 p.m., Boley was found on the floor of the Men's Work Center, and officers called for medical help.  (Mem. Opp'n Summ. J. 7; Pl. Ex. J, ECF No. 83-10.)  Copeland's letter states that Boley collapsed in the hallway near the kitchen, although Copeland later acknowledged that he did not personally see Boley collapse but only saw him on the ground being examined.  (Mem. Supp. Summ. J. 2, 8-9; Mem. Opp'n Summ. J. 6-7.)  Nurse Charlette Hayes

("Nurse Hayes"), then working at the nearby Deerfield Women's Work Center, received a call from a security officer at the Men's Work Center about an inmate complaining of chest pains and "having a seizure"; she immediately drove to the Men's Work Center to respond to Boley's condition.[2]  (Mem. Supp. Summ. J. 10; *see also* Pl.'s Ex. A., ECF No. 83-1.)  After arriving, Nurse Hayes took Boley's pulse and blood pressure around 3:00 p.m.  (Mem. Supp. Summ. J. 10; Mem. Opp'n Summ. J. 7; Hayes Tr. 90:1-6, 142:1-25, ECF No. 58-8.)  His blood pressure was 66/48, and his pulse was 60 beats per minute.  (*Id.*; Boley Med. R. 1, ECF No. 58-5.)  Nurse Hayes noted those values in Boley's chart and reached out to Dr. Alvin Harris ("Dr. Harris").  (*Id.*; Hayes Tr. 181:2-22.)  While waiting for Dr. Harris to return her call, Nurse Hayes once again took Boley's blood pressure, which had improved to 109/77, and pulse, which had risen to 74.  (Mem. Supp. Summ. J. 10; Boley Med. R. 1; Hayes Tr. 90:10-13.)

After some time, Dr. Harris returned Nurse Hayes's call, and Nurse Hayes informed him of Boley's complaints of chest pains and his low vital measures.  (Mem. Supp. Summ. J. 10; Hayes Tr. 182:6-24.)  Dr. Harris learned from his conversation with Nurse Hayes that Boley was alert and oriented.  In response, Dr. Harris instructed her to perform an EKG, and she did so.  (Mem. Supp. Summ. J. 11; Harris Tr. 48:13-17, ECF No. 58-9.)  The results of the EKG emerged as "Borderline Abnormal."  Nurse Hayes printed the results and read them to Dr. Harris on the phone.  (Mem. Supp. Summ. J. 11-12; Harris Tr. 58:25-59:3.)  Based on the information received, Dr. Harris decided that the results were not indicative of any acute condition or otherwise concerning, and instructed Nurse Hayes to give Boley 30 ml of Mylanta immediately and every two hours as needed.  (Boley Med. R. 1; Hayes Tr. 200:20-201:4, 202:5-17.)  Boley was then placed on the

---

[2] In some court documents, Nurse Charlette Hayes is referred to as "Charlehe Hayes." Because the Plaintiff's Complaint (ECF No. 1) refers to Hayes as "Charlette," the Court will refer to her as the same throughout this opinion.

sick-call list to be seen by Dr. Harris the next morning.  (Mem. Supp. Summ. J. 12.)  Around 6:52 p.m., a security officer called Nurse Hayes and informed her that Boley wished to see her again.  (Hayes Tr. 203:10-22.)  Nurse Hayes gave Boley his second dose of Mylanta and took his blood pressure and pulse again, which had improved to 114/82 and 80, respectively.  (Boley Med. R. 1; Mem. Supp. Summ. J. 13.)  Boley was then returned to his housing unit, where witnesses, including his brother James Boley, report that he continued to complain of severe pain in the middle of his chest.  (Mem. Opp'n Summ. J. 3; Tr. Call between R. Boley and J. Boley, 1:24-2:3.)  During the early morning hours of April 17, 2019, Boley was found dead from a ruptured aortic aneurism.  (Compl. ¶55, ECF No. 1.)

## II. PROCEDURAL HISTORY

Plaintiff James Boley, brother of the decedent Robert Boley, filed a four-count Complaint on April 14, 2021, alleging negligence, gross negligence, willful and wanton negligence, and federal civil rights violations under 42 U.S.C. § 1983.  (ECF No. 1.)  Defendants Armor Correctional Health Services, Inc. ("Armor"), Nurse Arleathia Peck, and Dr. Alvin Harris (collectively, "the Armor Defendants") filed an Answer to the Complaint on July 7, 2021.  (ECF No. 10.)  On April 19, 2022, the Armor Defendants filed a Motion for Summary Judgment and a Memorandum in Support.  (ECF Nos. 57-58.)  On April 25, 2022, the Armor Defendants filed a Motion to Exclude Plaintiff's Expert Witnesses William Bethea, Lisa Shawler, and Lori Roscoe, as well as a brief in support of that Motion.  (ECF Nos. 64-65.)  Plaintiff Boley filed a Motion in Opposition to the Motion to Exclude on May 9, 2022, and the Armor Defendants submitted a rebuttal brief on May 10.  (ECF Nos. 77, 79.)  On May 11, 2022, Plaintiff Boley filed a Memorandum in Opposition to the Armor Defendants' Motion for Summary Judgment (ECF No. 83), and the Armor Defendants filed their Reply on May 16 (ECF No. 85).

On July 8, 2022, Magistrate Judge Leonard granted the Armor Defendants' Motion to Exclude as to Lisa Shawler's ability to offer opinions regarding Armor Correctional Health Services and denied the Armor Defendants' Motion to Exclude in all other respects. (ECF No. 92.) On July 13, 2022, the Armor Defendants filed a Motion to Set Aside Judge Leonard's ruling on the Motion to Exclude, as well as a Memorandum in Support of that motion. (ECF Nos. 93-94.) Plaintiff filed a Memorandum in Opposition to the Motion to Set Aside on July 15, 2022 (ECF No. 95), and the Armor Defendants filed a Reply on July 18, 2022 (ECF No. 96).

### III. LEGAL STANDARD

Summary judgment is appropriately granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." *DiSciullo v. Griggs & Co. Homes*, 2015 WL 6393813, at *4 (E.D.N.C. Oct. 22, 2015). The burden then "shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "Evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Anderson*, 477 U.S. at 255; *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

"Furthermore, a 'material fact' is a fact that might affect the outcome of a party's case." *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 426–27 (E.D. Va. 2010) (citing

*Anderson*, 477 U.S. at 247-48). "Whether a fact is considered to be 'material' is determined by the substantive law, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* at 428. "In ruling on a motion for summary judgment, the court does not resolve the dispute itself; instead, it finds only that there is sufficient evidence of the dispute requiring that 'the parties' differing versions of the truth' be resolved at trial." *Diprete v. 950 Fairview St., LLC*, No. 1:15CV00034, 2016 WL 6137000, at *2 (W.D. Va. Oct. 21, 2016) (citing *Anderson*, 477 U.S. at 248-49). "If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489-90 (4th Cir. 2005).

## IV. DISCUSSION

### A. Negligence

Virginia recognizes three degrees of negligence, listed here in ascending order of severity: (1) simple or ordinary negligence, (2) gross negligence, and (3) willful or wanton negligence. *See Sams v. Armor Correctional Health Services, Inc.*, No. 3:19cv639, 2020 WL 5835310, at *30 (E.D. Va. Sept. 30, 2020). To prevail on a claim for negligence, a plaintiff must establish the applicable standard of care, that the defendant violated that standard, and that that breach was the proximate cause of the injury claimed. *Dixon v. Sublett*, 809 S.E.2d 617, 620 (Va. 2018); *accord Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). "The finding of a legal duty is a prerequisite to a finding of negligence." *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (internal quotation marks omitted). In medical negligence actions, expert testimony is needed to satisfy each element except where the defendant's negligence falls

within the common knowledge of lay jurors. *Raines v. Lutz*, 341 S.E.2d 194, 196 (Va. 1986); *see also Dixon*, 809 S.E.2d at 620-21.

### 1. Admissibility of Plaintiff's Expert Witnesses

The crux of the Armor Defendants' argument seeking summary judgment on Count One involves the disputed admissibility of testimony from Plaintiff's expert witnesses, namely that of William M. Bethea, M.D. as to the actions of Dr. Harris, and Lorie E. Roscoe, RN and Lisa Shawler, RN as to the actions of Nurse Peck. Defendants contend that Dr. Bethea fails to meet Virginia's "active clinical practice requirement" under Virginia Code § 8.01-581.20 because he had not performed the procedure of "assessment of acute or potentially emergent chest pain" within one year of the date of the act or omission forming the basis of this action. (Mem. Supp. Summ. J. 4; *see also* Mem. Supp. Mot. Set Aside 6, ECF No. 94.) Furthermore, the Armor Defendants claim that the testimony of Nurses Roscoe and Shawler incorrectly assumes that Boley saw Peck and reported his chest pains to her. (Mem. Supp. Summ. J. 4.) The Armor Defendants claim that, because Plaintiff's expert witnesses should be excluded, Plaintiff lacks the requisite expert testimony needed to satisfy each element of the negligence claims. The Armor Defendants first set forth these arguments in a Motion to Exclude and accompanying memorandum (ECF Nos. 64-65), filed on April 25, 2022, and again in their Motion to Set Aside Judge Leonard's ruling on the Motion to Exclude (ECF Nos. 93-94).

In a civil action, expert witnesses may offer testimony and render an opinion or draw inferences from facts, circumstances, or data made known to or perceived by such witnesses at or before the hearing or trial during which he is called upon to testify. *See* Va. Code § 8.01-401.1. In Virginia, expert testimony may be deployed to help the trier of fact to understand the issue or to determine a fact in dispute. *See* Va. Code § 8.01-401.3(A); *see also Keesee v. Donigan*, 524

S.E.2d 645, 647 (Va. 2000); *Tittsworth v. Robinson*, 475 S.E.2d 261, 263 (Va. 1996).  In short, disagreements about conclusions of facts are not sufficient cause to exclude expert testimony; rather, disagreements are simply cause to cross-examine the expert as to his or her conclusions. *See Pruitt v. BROC, LLC*, 2014 WL 5089115, at *3 (W.D. Va. Oct. 9, 2014).  Thus, the Court rejects Defendants' contention that testimony from Nurses Roscoe and Shawler should be omitted as to Nurse Peck due to their opinions being premised on facts in dispute.  If expert witnesses meet all other requirements, the veracity and weight of their testimony remains a question for the jury.

Defendants' arguments to exclude Dr. Bethea's testimony were more thoroughly addressed in the Court's Memorandum Opinion on Defendants' Motion to Set Aside the Magistrate Judge's opinion on their earlier Motion to Exclude (ECF No. 120).  In short, the Court denied Defendants' Motion to Set Aside, finding no clear error on the part of the Magistrate Judge, and determining that Defendants' very narrow definition of the procedure in question was not appropriate.  Ultimately, the Court affirmed that Dr. Bethea meets the active clinical practice requirement under Va. Code § 8.01-581.20.  (*Id*. 7.)  Defendants' arguments in support of summary judgment on Count 1 as to Dr. Harris relied entirely upon the argument that Plaintiff lacked the expert witnesses needed to sustain the count because they should be excluded.  The Court has dispensed with that argument in both this and earlier opinions.  Therefore, the Court will deny summary judgment as to ordinary negligence as to Dr. Harris.

### 2. *Testimony of David Copeland*

As to Nurse Peck, Defendants also contend that Plaintiff's case relies entirely upon the testimony of witness David Lee Copeland, one of Boley's fellow inmates.  Defendants point out that Copeland, although hearing from other others that Boley approached and was rebuffed by Nurse Peck, did not himself see that interaction.  (Mem. Supp. Summ. J. 8; *see also* Copeland Dep.

30:21-31:7, ECF No. 58-6.)   In fact, Defendants assert that Copeland had little first-hand knowledge of the day's events beyond a conversation between Copeland and Boley on April 16. (Mem. Supp. Summ. J. 8-10.)

However, as Plaintiff points out, there is sufficient evidence in the record that Boley was complaining of chest pain throughout the morning and afternoon of April 16, that he sought medical assistance at some point before 2:48 p.m., and that Nurse Peck was the nurse on duty during that time.   (Mem. Opp'n Summ. J. 17-18.)   Despite Defendants' characterization of Copeland's testimony as the product of mere chatter from "unnamed inmates," Copeland was not the sole witness on record recounting the events that might involve Nurse Peck in and around April 16, 2019.   Inmate Reggie Flowers swore in an affidavit that Boley repeatedly told him of his intense chest pains and desire to go to the hospital throughout the day, and states that he learned that Boley had sought medical help earlier in the day.  (Pl.'s Ex. C 1-2, ECF No. 83-3.)  Marese Francis, also incarcerated with Boley, reports that Boley sought medical aid prior to collapsing, and also accuses Nurse Peck of regularly closing the clinic early when she was on duty.  (*Id.* 6-7.) Further, Carlos Wilson, also in a sworn affidavit, claims that Nurse Peck was present when Boley was complaining of chest pain and collapsed.  (*Id.* 9.)

In a report written by Nurse Hayes dated April 17, 2019, Hayes recounts that Boley, "while in the presence of the lieutenant and two other officers stated that he had tried to come to medical earlier that day and was denied by medical staff." (Pl.'s Ex. A, ECF No. 83-1; Mem. Opp'n Summ. J. 5.)  A phone call between Boley and his older brother James confirms this account, with Robert Boley telling James Boley that the nurse he was "chasing down" gave him "the brush off game" before a second woman called for additional medical help shortly after.  (Pl.'s Ex. B 5, ECF No. 83-2.)  By her own admission, Nurse Peck was the only nurse known to be in the medical office

until 2:30 p.m. on April 16, 2019, and her time sheet indicates that she signed out of work a mere eight minutes before other medical aid was called for Boley.  (Peck Dep. 2, 101:9-102:7, ECF No. 83-7; *see also* Def.'s Ex. D, ECF No. 58-4.)  A jury could consider this circumstantial evidence and reasonably infer that Nurse Peck was the nurse who interacted with, and allegedly rebuffed, Boley on the day in question.  Taken together, the record yields enough genuine disputes of material fact to survive summary judgment.  Thus, the Court will deny summary judgment as to ordinary negligence as to Nurse Peck.

### B. Gross Negligence

In Virginia, gross negligence is the "degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of other such person."  *Elliot v. Carter*, 791 S.E.2d 730, 723 (Va. 2016) (*quoting Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918-19 (Va. 2004)).  Gross negligence requires "a degree of negligence that would shock fair minded persons."  *Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021) (*quoting Cowan*, 603 S.E.2d at 918).  The standard is one of "indifference, not inadequacy."  *Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020) (*citing Elliot*, 791 S.E.2d at 732).  Therefore, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care.  *Id*.

In addition, a claim for gross negligence requires a lesser showing of recklessness than a claim of deliberate indifference.  *Hixson v. Hutcheson*, 5:17-CV-00032, 2018 WL 81059, at *6 (W.D. Va. Feb. 9, 2018).  The plaintiff in a gross negligence case is not required to establish that the defendant subjectively knew of a substantial risk, but must demonstrate only that the defendant should have known that such a risk existed.  *See Coppage v. Mann*, 906 F. Supp. 1025, 1049 (E.D. Va. 1995).

### 1. Nurse Peck

Defendants argue that, even if Nurse Peck interacted with Boley on April 16, nothing in the record supports a finding that she disregarded the decedent's needs in a manner that shocks the conscious, as is required to find her liable of gross negligence.  Plaintiff argues that Nurse Peck's failure to provide immediate attention to a patient complaining of severe chest pains, her failure to document her encounter with him, and her failure to inform others about his condition combine to constitute gross negligence.  *See Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 801 (Va. 1996) ("Several acts of negligence which may separately not amount to gross negligence, when combined may have a cumulative effect of showing a form of reckless or total disregard for another's safety.").

Expert witness Lori Roscoe opines that if Nurse Peck did speak with Boley and instructed him to submit a sick call request rather than immediately evaluating his complaints of chest pain, "she significantly deviated from the nursing standard of care."  (Def.'s Ex. F 6, ECF No. 83-6.) At a minimum, Nurse Roscoe explains, Nurse Peck should have obtained a medical history and complete description of the chest pain from Boley, taken his vitals and performed a physical examination, and if unable to do so, should have ensured that a proper evaluation was performed by another nurse.  (*Id.*)  Even if Nurse Peck was not aware that chest pain was a potentially serious condition that requires immediate attention, she should have known of the high risks associated with the condition. A jury could determine that the allegations against Nurse Peck, when considered cumulatively, could constitute gross negligence.  Because there remain facts on the record to support such a finding, the Court denies summary judgment on Count Two, Gross Negligence, as to Nurse Peck.

### 2. Dr. Harris

The Defendants contend that undisputed facts show that, at a minimum, Dr. Harris responded to Nurse Hayes's call for assistance, ordered an EKG based on Boley's complaints, interpreted the results of the EKG, ordered a prescription, and scheduled a follow-up appointment with the patient.  (Mem. Supp. Summ. J. 25.)  Such actions are sufficient to constitute "some degree of care."  *See Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008).  On the other hand, Plaintiff disputes Defendants' characterization of Dr. Harris's actions.  (Mem. Opp'n Summ. J. 23-24.)  Plaintiffs also argue that the "some degree of care" needed to overcome gross negligence liability is different and greater than *any* care.  (*Id.*)

Plaintiff has presented expert testimony that Dr. Harris fell below the applicable professional standard of care by failing to immediately transfer Boley "to a facility capable of appropriately evaluating his complaints and physical findings."  (Pl.'s Ex. F 12, ECF No. 83-6.)  Unlike deliberate indifference, the gross negligence standard does not require a finding that Dr. Harris subjectively knew of a substantial risk, but that he should have known of the substantial risk that Boley was experiencing a serious cardiac event.  Even absent the aid of expert witnesses, lay jurors could likely understand that Boley's symptoms betrayed a potentially serious illness.

The parties do not dispute that Dr. Harris responded to the duty nurse's call, gave instructions to conduct an EKG, interpreted those results over the telephone, and offered a diagnosis and medication to Boley.  However, the parties do dispute exactly what Dr. Harris knew, including whether he knew of the severity and frequency of Boley's complaints.  Despite this uncertainty, it is not disputed that, after ordering an EKG, Dr. Harris interpreted the results as "Borderline Abnormal" but failed to recommend transport to the hospital.  (Mem. Supp. Summ. J. 12.)  Further, Dr. Harris's interpretation of the results was done absent key demographic considerations like age and sex.  Nurse Hayes also testified in her deposition that she read the EKG

results to Dr. Harris over the telephone; he did not see a printout of the results prior to determining that Boley had indigestion.  (Mem. Opp'n Summ. J. 9; Pl. Ex. D 197.)  Dr. Bethea, expert witness for Plaintiff, opines that "there is no possible interpretation of [the EKG] that would allow the disposition that Dr. Harris chose."  (Pl.'s Ex. F 12, ECF No. 83-6.)  In a deposition, Dr. Harris admits that he knew that Boley complained of chest pains when Nurse Hayes first called him, and he knew of Boley's then blood pressure reading of 66/48, which Harris characterized as "a bit low."  (Pl.'s Ex. E 26:13-18, ECF No. 83-5.)  The issue is whether the actions taken by Dr. Harris rise to the admittedly low level of "some degree of care," *Kuykendall,* 261 F. App'x at 491, or whether the potential severity of the diagnosis required more of him.

 "A juror is permitted to take into account the fact that the consequences of a misdiagnosis . . . were extreme.  That is, an action that is taken in the face of a risk of slight harm might be reasonable; but the same action taken in the face of extreme harm might be negligent or grossly negligent." *Coppage*, 906 F. Supp. at 1049.  In *Coppage*, the Court denied summary judgment to a physician where a serious cancerous tumor at the base of an inmate's spine was misdiagnosed as a muscle strain, leading to permanent pain and debilitation.  The physician, Dr. Mann, did order tests, examine, prescribe ibuprofen to Coppage, and after months, ultimately ordered an MRI which discovered the cancer diagnosis.  However, the Court found that a reasonable juror could conclude that Dr. Mann should have known that it was highly possible Coppage was suffering from compression of the spinal cord rather than a conversion reaction disorder in light of his many symptoms.  *Id*.

Although the present case deals with acute presentation of symptoms, it is otherwise similar to *Coppage*.  Boley presented with clear symptoms of cardiac distress – including new and severe chest pains, extremely low blood pressure, weakness, low pulse, and an abnormal EKG reading –

together widely understood to represent a potentially deadly episode.  Dr. Bethea presents evidence that a reasonable physician should have been aware of this risk, and thus should have acted immediately to secure adequate treatment.  Here, a jury may find that due to the extreme and open risk of harm absent basic care of arranging transport to a hospital, the standard of "some degree of care" was not met.  Therefore, the Court will deny summary judgment on Count Two, Gross Negligence, as to Dr. Harris.

### C.  Deliberate Indifference and Willful and Wanton Negligence

The Court will analyze Count Three, Willful and Wanton Negligence, and Count Four, Violation of Civil Rights under 42 U.S.C. § 1983, together due to the close relationship of the elements of their respective legal standards.  Defendants assert that neither Nurse Peck nor Dr. Harris were aware of the inadequacy of their actions and that they did not know that their acts or omissions would likely harm Boley.  (Mem. Supp. Summ. J. 22.)  Plaintiff counters that Defendants failed to provide constitutionally adequate treatment to Boley and that they behaved callously towards him and his needs. (Mem. Opp'n Summ. J. 17-22.)

#### 1. Denial, Delay, and Withholding of Medical Care in Violation of Eighth and Fourteenth Amendments

The Eighth Amendment's protection against cruel and unusual punishment is violated when officials exhibit "deliberate indifference to serious medical needs of prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  In the context of inadequate medical care, there is an objective and a subjective element.  *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021).  "The plaintiff must demonstrate that the [defendant] acted with deliberate indifference (subjective) to the inmate's serious medical needs (objective)."  *Id.*; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  A medical condition is objectively serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so

14

obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241.  To establish the subjective element, the plaintiff must show that "the official subjectively knew of and disregarded an excessive risk to the inmate's health or safety." *Moran*, 1 F.4th at 302 (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). "A deliberately indifferent state of mind can be proven through 'inference from circumstantial evidence.'" *Thompson v. Commonwealth*, 878 F.3d 89, 108 (4th Cir. 2017) (*quoting Farmer*, 511 U.S. at 842).

"Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Moran*, 1 F.4th at 303 (*quoting Farmer*, 511 U.S. at 835).  Mere misdiagnosis, or failure to provide a more effective course of treatment are insufficient to establish deliberate indifference. *See Jackson*, 775 F.3d at 178; *see also Blevins v. Horry Cty.*, No. 4:11-03267, 2012 WL 5990105, at *5 (D.S.C. Oct. 31, 2012) ("[I]ncorrect medical treatment, such as an incorrect diagnosis, is not actionable . . . ."); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . .doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference . . . .").  The treatment provided "must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Moran*, 1 F.4th at 303 (*quoting Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)).

### a. Nurse Peck

To satisfy objective prong of deliberate indifference, an incarcerated person must present facts that suggest the deprivation complained of was extreme and went beyond the "routine discomfort" that can be "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993).  Several courts have determined that chest pain satisfies the objective prong of the deliberate indifference standard.

*See, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) ("[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard."); *Melvin v. Cty. of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *5 (S.D.N.Y. Mar. 29, 2016) (finding that defendant's complaints of chest pain coupled with high blood pressure and a low pulse satisfied the objective prong); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1310 (D. Colo. 2009) (finding that the plaintiff's allegation of suffering chest pain over a period of several hours satisfied the objective element of the test). Boley's complaints of and presentation with severe and persistent chest pain qualify as a serious medical condition in satisfaction of the objective prong.

The second, subjective prong of the deliberate indifference standard is that "officials acted with a sufficiently culpable state of mind." *Jehovah v. Clarke*, 798 F.3d 169, 181 (4th Cir. 2015) (*quoting De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).  Prison-based medical staff are required to provide inmates with constitutionally adequate treatment, not merely "some treatment."  *De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).  A prison medical professional who serves "'as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'"  *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.2d 1205, 1211 (10th Cir. 2000)).  Moreover, a prison official's "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs."  *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016).

In *Mata v. Saiz*, an inmate sought assistance from a licensed practical nurse at the prison infirmary for severe chest pains.  427 F.3d at 750.  Rather than offering treatment or referral, the nurse informed her that the infirmary was closed and instructed her to return the next morning.  *Id*.

The following morning, a second nurse performed an EKG that produced normal results.  Id.  As the chest pains continued, the inmate saw two more nurses; the fourth nurse contacted a doctor who ordered the inmate sent to the hospital immediately.  *Id*.  The hospital determined that the inmate had suffered a heart attack that produced irreversible heart damage.  *Id*.  The court found that the inmate had a plausible claim of deliberate indifference against the first nurse who told her the "infirmary was closed" and refused to perform her gatekeeper role by not seeking an evaluation from another medical professional.  *Id*. at 756.

Like in *Mata*, Plaintiff in this case alleges that Nurse Peck, in her rush to leave work for the day, turned away an inmate facing potentially serious chest pain and requesting aid.  The Plaintiff has offered evidence, albeit disputed, that Nurse Peck, the only nurse known to be at the Men's Work Center between 6:00 a.m. and 2:40 p.m., encountered Boley while he was experiencing serious chest pain and refused him immediate assistance.  Nurse Peck was familiar with Boley, and it was known to prison officials that Boley had a history of hypertension and took medication for it.  (Mem. Supp. Summ. J. 7, 11.)  Although their accounts are somewhat inconsistent, several individuals incarcerated with Boley who encountered him prior to his examination by Nurse Hayes describe him as complaining about serious chest pain, clutching his chest, and displaying clear signs of physical distress over a period of several hours.  (Pl.'s Ex. C, ECF No. 83-3.)  Further, Nurse Hayes records that Boley relayed to her that he had approached "medical" for help and was turned away; Boley repeated these claims to his brother on the evening of April 16.  (Pl.'s Ex. A, ECF No. 83-1; Pl.'s Ex. B, ECF No. 83-2.)  Viewed cumulatively, there is some amount of evidence that Nurse Peck knew of Plaintiff's medical need and failed to respond to that need, raising an inference of deliberate indifference.  *See Scinto*, 841 F.3d at 229.  There

remains a genuine dispute of fact as to whether Nurse Peck reasonably responded to Boley's medical needs.

### b. Dr. Harris

Defendants do not fully challenge the assertion that Boley's presentation of chest pain represents a serious medical need under the objective prong of the deliberate indifference test. Defendants briefly mention that Dr. Bethea did not opine that the EKG results provided objective evidence of an acute condition, and they mention that chest pain may be a symptom of indigestion; however, case law indicates that the presence of chest pain alone is likely enough to rise to the necessary level of seriousness. (Mem. Supp. Summ. J. 25.) Officials working in prison settings "may not simply bury their heads in the sand and thereby skirt liability" by, for example, refusing to "verify underlying facts that [they] strongly suspect to be true, or . . . declin[ing] to confirm inferences of the risk that [they] strongly suspect to exist." *Makdessi v. Fields*, 789 F.3d 126, 133-34 (4th Cir. 2015) (internal quotation marks omitted). As discussed above, ample evidence, both disputed and undisputed, indicates that Boley suffered from a serious medical need that commenced prior to his interactions with both Nurse Peck and Dr. Harris. As such, the Court finds that the objective element may be met as to Dr. Harris.

As to the subjective prong, the Court notes that provision of "some treatment" is not always sufficient to defeat deliberate indifference claims. "Some treatment" is not necessarily "constitutionally adequate treatment." *King v. United States*, 536 Fed. App'x 358, 362-63 (4th Cir. 2013); *see also De'Lonta*, 708 F.3d at 526. However, constitutionally adequate treatment is not necessarily good treatment, or even treatment absent mistake. "Though hindsight suggests that [a physician's] treatment decisions may have been mistaken, even gravely so. . . [courts]

consistently have found [disagreements between doctors and patients] to fall short of showing deliberate indifference." *Jackson*, 775 F.3d at 178.

Concerning deliberate indifference, Dr. Harris's actions represent a close call, appearing to be grave misdiagnosis from one perspective and grave indifference from another. On one hand, Dr. Harris did act to determine the source of Boley's symptoms by ordering an EKG, and specifically sought to rule out a myocardial infarction (i.e., heart attack) through the test. (Mem. Supp. Summ. J. 25.) Defendants can credibly argue that Dr. Harris, though missing an important diagnosis, relied upon his expertise and training to make a professional determination about Boley's condition.

In *Johnson v. Quinones*, an inmate named Johnson suffering from deterioration of his vision, night sweats, headaches, acromegalia, and cutis laxa consulted doctors about his conditions. 145 F.3d 164, 168 (4th Cir. 1998). After several visits and exams, the prison physician determined that Johnson was a "malingerer" and ordered no further treatment. *Id*. at 166. Upon his release from prison, Johnson quickly lost vision both eyes. *Id*. An examination outside of prison revealed that he suffered from a pituitary tumor, and that the tumor was the cause of his vision loss. *Id*. Johnson sued the prison doctor, arguing that the doctors should have known about the possibility of a pituitary tumor based on the multitude of symptoms, and that the doctor was deliberately indifferent in his failure to diagnose and treat his condition. *Id*. at 166-68. The Court ruled in favor of the doctor on summary judgment. *Id*. at 167-68. Finding that the doctor did not know that Johnson had a pituitary tumor, the Court wrote that "the correct question is whether the doctor subjectively knows of the serious medical condition itself, not the symptoms of the serious medical condition." *Id*. at 168 (internal quotation marks omitted). Like in *Johnson*, Dr. Harris misdiagnosed Boley to Boley's detriment after reviewing the symptoms presented and deciding

their root causes to be benign rather than urgent.  Moreover, Dr. Harris did not know that Boley was experiencing an unstable aortic aneurysm, only certain symptoms of the condition such as unstable blood pressure and serious chest pains.

Despite this, Plaintiff's evidence creates a genuine dispute of material fact as to *Farmer's* subjective prong.  A prisoner can establish a claim of deliberate indifference by showing that the care given was grossly inadequate, and that a doctor decided to take an easier but less efficacious course of treatment.  *King*, 536 F. App'x at 362.  This standard can be satisfied when the need for treatment is obvious, yet medical officials provide medical care that is so cursory as to amount to no treatment at all.  *Id*.  The Court cannot and will not opine on Dr. Harris's state of mind when he decided that Boley's condition required no hospitalization or further examination despite his complaints, vitals, and borderline abnormal EKG.  That is an inquiry for the factfinder.  But the Court acknowledges that Plaintiff has some evidence that Dr. Harris understood the risks inherent in Boley's symptoms and prioritized ease to himself or the prison facilities in the face of a serious risk to Boley's wellbeing.

As the on-call physician, Dr. Harris was made aware—by Nurse Hayes—that Boley's blood pressure was abnormally low, that Boley was actively experiencing chest pains, and that his pulse was low (Pl.'s Ex. A; Pl.'s Ex. D 182:18-183:12).  Dr. Harris did order an EKG, but did not endeavor to view the results himself, instead having Nurse Hayes read them to him over the telephone.  (Mem. Supp. Summ. J. 2.)  When the results of the test returned as "Borderline Abnormal," Dr. Harris decided not to investigate beyond re-taking vitals, even in light of Boley's clear complaints and additional symptoms.  (*Id*. 12.)  And unlike symptoms of the pituitary tumor experienced by inmate Johnson in *Johnson v. Quinones*, some of the symptoms experienced by Boley are themselves known, even to laypersons, not only to be common signs of a medical

emergency, but also to be so inextricably tied to such emergencies that it is reasonable to seek urgent care for severe chest pain alone.  Plaintiff's expert witness Dr. Bethea provides the jury more basis for this determination, as he claims that Dr. Harris had "no acceptable alternative dictated by the standard of care but to immediately transfer the patient to a facility capable of rapidly pursuing those life-threatening possible explanations prior to considering and treating a non-threatening diagnosis, such as 'indigestion.'"  (Pl.'s Ex. F 11.)

Because Plaintiff can present evidence of Dr. Harris's deliberate indifference, the Court will deny summary judgment on Count Four of the Complaint.

### 2. Willful and Wanton Negligence

 Willful and wanton negligence is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct would likely cause injury to another." *Cowan*, 603 S.E.2d at 918-19 (internal quotations and citations omitted).  It is the most extreme level of negligence under Virginia law. *See id*.  It requires "more than inattention and neglect." *Doe v. Baker*, 857 S.E. 2d 573, 588 (Va. 2021).  Willful and wanton negligence is distinguished from ordinary or gross negligence by the defendant's "actual or constructive consciousness that injury will result from the act done or omitted." *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999).

Under Virginia law, the standard for willful and wanton negligence closely mirrors the subjective prong of the deliberate indifference test. *Hixson v. Hutcheson*, 5:17-CV-00032, 2018 WL 814059, at *9 (W.D. Va. Feb. 9, 2018).  Because the Court denied summary judgment to the Defendants on both the objective and subjective prongs of the deliberate indifference standard, the

Court also denies summary judgment on the similar but diminished count of willful and wanton negligence as to all Defendants.

## V. CONCLUSION

For the foregoing reasons, the Court will deny the Armor Defendants' Motion for Summary Judgment on all counts of the complaint as to Armor Correctional Health Services, Inc., Dr. Alvin Harris, and Nurse Arleathia Peck.

An appropriate Order shall issue.

_____
/s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: <u>November 15, 2022</u>