IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JAMES A. BOLEY, JR., *Administrator of* )
*the Estate of Robert Lee Boley*, )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )        Civil Action No. 2:21CV197 (RCY)
                                        )
ARMOR CORRECTIONAL HEALTH               )
SERVICES, INC., *et al.,*               )
                                        )
        Defendants.                     )
                                        )

**MEMORANDUM OPINION**

This matter is before the Court on Defendants Sergeant Emmanuel Bynum's and Officer Joel Guy's Motion for Summary Judgment (ECF No. 60).  The motion has been briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated herein, the Court will deny summary judgment to the Defendants on all counts of the Complaint.

**I. FACTS**

Slightly after 9:00 a.m. on April 16, 2019, Robert Boley ("Boley") began to experience chest pains while in the Deerfield Men's Work Center ("Men's Work Center") recreation area. (Compl. ¶ 19, ECF No. 1.)  According to witness David Lee Copeland, a fellow inmate, Boley sought out Nurse Arleathia Peck ("Nurse Peck") and asked to be seen for his chest pains.  Nurse Peck, who was the nurse on duty at the Men's Work Center, instructed Boley to fill out a request form and "send it to sign up for sick call."  (Compl. ¶ 20; *see also* Copeland Letter 1-2, ECF No.

1

58-7.)  Nurse Peck did not examine him or send him to a physician.  (*Id.*)  Between 2:45 and 3:00 p.m., Boley fell to the ground and sat down outside the medical office until a staff member at the Men's Work Center called for medical assistance from the nearby Women's Work Center.  (Mem. Supp. Summ. J. 3, ECF No. 61; Mem. Opp'n Summ. J. 3, ECF No. 82.)  When Nurse Charlette Hayes ("Nurse Hayes") arrived at the Men's Work Center, Boley was still sitting on the floor outside of the medical center with three correctional officers attending him.[1]  (Mem. Supp. Summ. J. 3.)  Nurse Hayes examined Boley and performed an EKG at the request of a physician, Dr. Alvin Harris.  (*Id.*)  After deciding that there was no emergency and that Boley was suffering from indigestion, Dr. Harris told Nurse Hayes to place Boley on the sick call list to be seen the following day.  (*Id.*)

Boley's chest pain did not improve after his interaction with Dr. Harris and Nurse Hayes. A logbook entry from 4:37 p.m., presumably made by Lt. Daniels, reports, "Checked on offender Boley #1100422 still in pain [illegible] (chest)."  (*See* Pl.'s Ex. D 27, ECF No. 82-4.)  Defendant Sgt. Emmanuel Bynum, the watch commander for the night shift on April 16, reported to work around 5:00 p.m. and received a briefing from the exiting daytime watch commander, Lt. Daniels. (Mem. Supp. Summ. J. 7; Boley Tr. 68:5-20, ECF No. 61-5.)  The outgoing commander informed Defendant Bynum that Boley "was going to see a doctor in the morning due to the fact that he fell ill during the day."  (Mem. Supp. Summ. J. 7; Bynum Tr. 105:5-10, ECF No. 61-5.)

Defendant Bynum later spoke with Boley in his cell, though the nature and content of their conversation is disputed.  Defendant Bynum claims that Boley, during this conversation, told him that he was "all right."  (Mem. Supp. Summ. J. 7; Bynum Tr. 115:24-25.)  However, Reggie

---

[1] In some court documents, Nurse Charlette Hayes is referred to as "Charlehe Hayes." Because the Plaintiff's Complaint (ECF No. 1) refers to Hayes as "Charlette," the Court will refer to her as the same throughout this opinion.

Flowers, one of Boley's fellow inmates in his block, asserts that Boley had been seeking to go to the hospital, "but Sgt. Bynum claimed that they could not get an ambulance because they were short staffed that day." (Pl.'s Ex. A 2, ECF No. 82-1; Mem. Opp'n Summ. J. 5.)  Flowers also reports that Boley verbally expressed his pain and discomfort to those around him for several hours, making statements including "I can't breathe," "I've got chest pains," "my chest is real tight," and "I need to go to the hospital." (Pl.'s Ex. A 1.)  Other inmates corroborate that Boley felt and displayed signs of chest pain throughout the day. (*See id*. 6 ("He told me his 'chest was killing him' or words to that effect").)

Defendant Officer Joel Guy began his shift around 5:30 p.m. (Guy Tr. 23:10-16, ECF No. 61-6.)  His responsibilities included performing security checks of the housing wings and conducting inmate counts. (Guy Decl. 1, ECF No. 61-2.)  At one point during the evening, inmates asked Guy to check on Boley because of concerns about his health. (Guy Tr. 74:22-76:20; Pl.'s Ex. A 1-2.)  Inmate David Lee Copeland asserts that Guy visited Boley in his cell and likely spoke to him for approximately two minutes before leaving. (Copeland Tr. 49:19-50:3, ECF No. 82-7.)  Another inmate, Reggie Flowers, claims that Boley told Guy that he needed to go to the hospital as his chest was "really tight." (Pl.'s Ex. A 2.)  On the other hand, Guy only recalls checking on Boley during one of his normal rounds, where he witnessed Boley sitting up, watching television, and drinking water while in his cell. (Guy Tr. 75:4-20, ECF No. 61-6.)  It is disputed when and whether Guy performed all of his security checks on evening of April 16, 2019 and the early morning of April 17, 2019. (*See* Mem. Opp'n Summ. J. 9.)  Guy claims that he performed security checks at 7:27 p.m., 9:24 p.m., 1:23 a.m., and 4:21 a.m. (Guy Decl. 1; Guy Tr. 38:15-39:10.)  However, inmate Carlos Wilson claims that Guy made no rounds between 8:00 p.m. and midnight. (Mem. Opp'n Summ. J. 9.)

Around 6:52 p.m., Defendant Bynum called Nurse Hayes back to the Men's Work Center to speak to Boley and administer his second dose of medication (Geri Lanta) prescribed by Dr. Harris earlier that afternoon.  (Bynum Tr. 118:2-12; Pl.'s Ex. J., ECF No. 82-10.)  Nurse Hayes recalls that Boley expressed to her that, while he still felt some discomfort, he was feeling better than earlier in the day when he fell.  (Hayes Tr. 204:8-13, ECF No. 82-9.)  However, Reggie Flowers' affidavit contends that Boley told Nurse Hayes that he needed to go to the hospital.  (Pl.'s Ex. A 1-2.)  Around 7:00 p.m., inmate David Lee Copeland spoke with Boley in his cell, where Boley stated, "My chest is killing me, man."  (Mem. Supp. Summ. J. 4; Mem. Opp'n Summ. J. 4; Pl.'s Ex. G 29:7-9, ECF No. 82-7.)  In a recorded call between inmate Robert Boley and his brother Plaintiff James Boley around 9:46 p.m., Robert Boley expressed that, although medical staff gave him medication for indigestion, the medication did not quell his symptoms.  (Tr. Call R. and J. Boley 2:23-25, ECF No. 82-6, describing how he cannot eat food; *id.* 8:4-8, describing the feeling of a pocket in his chest.)  Robert Boley complained that "[t]his shit been going on since 9 o'clock this morning.  It still hang up in your chest like that?"  (*Id.*, 10:2-6.)

Throughout the evening, Boley's brothers called the prison several times.  (Mem. Supp. Summ. J. 7.)  Bynum listened to their concerns but believed that "the nurse [who evaluated Mr. Boley] would know his condition more than his brothers."  (Bynum Tr. 155:2-4.)  Plaintiff James Boley testified that Bynum seemed dismissive, repeatedly telling him that Boley was okay.  (J. Boley Tr. 31:7-14, ECF No. 82-8.)  Nonetheless, James Boley insisted that his brother needed to seek medical attention "off the camp" for his chest pains.  (*Id.*)  Michael Boley also spoke to Bynum that night.  Although Bynum did inform Michael Boley that prison officials "were planning on sending my brother outside the facility to see a doctor," he did not give timeline for the visit.  (M. Boley Aff. 2, ECF No. 82-11.)  Later that evening, Michael Boley again spoke to Bynum and

described him as "rude, condescending, and disrespectful," with Bynum saying, "I told you earlier he [R. Boley] is good." (*Id*.)

Between 9:00 p.m. and 10:00 p.m., Bynum summoned Boley to the watch commander's office "so he could talk to his family." (Bynum Tr. 91:9-12.) Bynum recalls that Defendant Officer Guy escorted Boley to the watch commander's office, but Guy contends that he never accompanied Boley as Bynum requested. (*See* Guy Tr. 57:12-23, ECF No. 82-3.) Guy noticed that Boley "was moving a little slow," but was nonetheless able to walk to the watch commander's office unassisted. (*Id*.) Guy does not recall seeing Boley ever enter or exit the watch commander's office. (*Id*.)

Around 9:46 p.m., Boley spoke with his brother James for several minutes via telephone. On the call, Boley appeared to speak clearly and coherently about his day. (*See generally* Tr. Call R. and J. Boley.) Speaking to his brother, Boley again expressed discomfort, pain in the center of his chest, his low blood pressure, his inability to keep down food, and feelings of lightheadedness that occurred earlier in the day. (*Id*. 7:11-12; 8:4-20; 10:2-25.) Boley did not mention any corrections officers or non-medical personnel by name during the call. (*Id*.) It is disputed whether this call took place in the watch commander's office, as planned, or from a recorded inmate line. (Mem. Supp. Summ. J. 8; Mem. Opp'n Summ. J. 7.) Boley's brothers allegedly continued to call Bynum to express concerns about Boley's condition even after Boley had spoken to them on the telephone. (Mem. Opp'n Summ. J. 8; Bynum Tr. 237:2-8.)

At some point after the phone call with James Boley, Boley returned to his room and laid down on his bed. Officer Guy reports that, during a security check, he observed Boley sleeping in his cell with his head toward the window and his feet toward the door. (Guy Decl. 1.) Officer Bynum conducted a security round at approximately 2:30 a.m. and testifies that Boley was in his

cell "breathing" and "asleep," laying down towards the window.  (Bynum Tr. 166:20-22, 167:4-5.)

During the 5:30 a.m. count on April 17, 2019, Officer Guy and Officer Denise Jones found Boley slumped over and sitting on the edge of his bed in his cell, with "[his] eyes opened" and "snot and drool coming from his mouth and nose." (Guy Tr. 72:17-73:4; Investigative R. 5-6, ECF No. 82-4.)  Boley was unresponsive.  (Guy Tr. 72:17-73:4; Investigative R. 5-6.)  At 6:10 a.m., a doctor pronounced Boley dead.  (Investigative R. 4.)  On April 18, 2019, the Office of the Chief Medical Examiner in Norfolk concluded that Boley died of a "ruptured aortic aneurysm due to hypertensive and atherosclerotic cardiovascular disease." (Compl. ¶ 55.)

## II. PROCEDURAL HISTORY

Plaintiff James Boley, brother of the decedent Robert Boley, filed a four-count Complaint on April 14, 2021, alleging negligence (although not against Defendants Bynum and Guy), gross negligence, willful and wanton negligence, and federal civil rights violations under 42 U.S.C. § 1983 (ECF No. 1).  On July 28, 2021, Defendants Bynum and Guy ("the Correctional Officer Defendants") filed a Motion to Dismiss for Failure to State a Claim (ECF No. 23).  On September 27, 2021, the Correctional Officer Defendants filed an Answer to the Complaint, denying all counts made against them (ECF No. 38).  The Court denied the Correctional Officer Defendants' Motion to Dismiss as to all counts of the Complaint on March 28, 2022.  (ECF Nos. 50-51.)  On April 21, 2022, the Correctional Officer Defendants filed a Motion for Summary Judgment and accompanying Memorandum in Support (ECF Nos. 60-61).  On May 11, Plaintiff filed a Memorandum in Opposition to Correctional Officer Defendants' Motion for Summary Judgment, and on May 17, the Correctional Officer Defendants filed their Reply (ECF Nos. 82, 86).  The trial for this action is scheduled to commence on December 5, 2022.  (ECF No. 91.)

## III. LEGAL STANDARD

Summary judgment is appropriately granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." *DiSciullo v. Griggs & Co. Homes*, 2015 WL 6393813, at *4 (E.D.N.C. Oct. 22, 2015). The burden then "shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "Evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Anderson*, 477 U.S. at 255; *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

"Furthermore, a 'material fact' is a fact that might affect the outcome of a party's case." *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 426–27 (E.D. Va. 2010) (citing *Anderson*, 477 U.S. at 247-48). "Whether a fact is considered to be 'material' is determined by the substantive law, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* at 428. "In ruling on a motion for summary judgment, the court does not resolve the dispute itself; instead, it finds only that there is sufficient evidence of the dispute requiring that 'the parties' differing versions of the truth' be resolved at trial." *Diprete v. 950 Fairview St., LLC*, No. 1:15CV00034, 2016 WL 6137000, at *2 (W.D. Va. Oct. 21, 2016) (citing *Anderson*, 477 U.S. at 248-49). "If the evidence

as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489-90 (4th Cir. 2005).

## IV. DISCUSSION

### A. Gross Negligence

Virginia recognizes three degrees of negligence, listed here in ascending order of severity: (1) simple or ordinary negligence, (2) gross negligence, and (3) willful or wanton negligence. *See Sams v. Armor Correctional Health Services, Inc.*, 2020 WL 583510, at *30 (E.D. Va. Sept. 30, 2020). To prevail on a claim for negligence, a plaintiff must establish the applicable standard of care, that the defendant violated that standard, and that that breach was the proximate cause of the injury claimed. *Dixon v. Sublett*, 809 S.E.2d 617, 620 (Va. 2018); *see also Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). "The finding of a legal duty is a prerequisite to a finding of negligence." *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (internal quotation marks omitted).

In Virginia, gross negligence is the "degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliot v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (*quoting Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918-19 (Va. 2004)). Gross negligence requires "a degree of negligence that would shock fair-minded persons." *Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021) (*quoting Cowan*, 603 S.E.2d at 918). The standard is one of "indifference, not inadequacy." *Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020) (*citing Elliot*, 791 S.E.2d at 732). Therefore, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care. *Id.*

In addition, a claim for gross negligence requires a lesser showing of recklessness than a claim of deliberate indifference. *Hixson v. Hutcheson*, 5:17-CV-00032, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018). The plaintiff in a gross negligence case is not required to establish that the defendant subjectively knew of a substantial risk, but only must demonstrate that the defendant should have known that such a risk existed. *See Coppage v. Mann*, 906 F. Supp. 1025, 1049 (E.D. Va. 1995).

The Court will deny summary judgment to both Bynum and Guy as to Count Two of gross negligence. As correctional officers, Defendants Bynum and Guy owed a duty of care to Boley. *Farmer v. Brennan*, 511 U.S. 825, 825 (1994) ("Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement. They must ensure that inmates receive adequate food, clothing, shelter, and medical care . . . ."); *see also* Va. Code § 53.1-126 (stating that, with regard to detainees and inmates, medical treatment shall not be withheld for any serious medical needs or life-threatening conditions).

Defendants do not contest the fact that they owed a legal duty of care to Boley in their Motion for Summary Judgment, but do assert that neither Bynum nor Guy breached that duty. The Correctional Officer Defendants aver that they did not know of Boley's condition, that they were particularly unaware that his condition persisted into the evening hours, and that they took appropriate actions in response to their knowledge at the time. (*See* Mem. Supp. Summ. J. 13-16.) "Whether reasonable care was exercised depends upon what a reasonably prudent person, with knowledge of the circumstances, ought to have foreseen in regard to the consequences of his act or omission." *RGR LLC v. Settle*, 280 S.E.2d 8, 20 (2014) (internal citations omitted). However, Plaintiff has offered evidence that Bynum and Guy knew that Boley was suffering from a serious medical ailment and did not act reasonably in response to that knowledge. In addition, a reasonable

juror may determine that Defendants' lack of action amounted to a "complete neglect of the safety" of Boley and betrayed indifference to his life and wellbeing.  *Elliot*, 791 S.E.2d at 732.

### 1. Defendant Bynum

Defendant Bynum admits that, when he called Boley to the watch commander's office, Boley described himself as "sleepy" and asked Bynum about his persistent heartburn for approximately ten minutes.  (Investigation R. 6, 11.)  Plaintiff contends that there was more, and that Bynum's own narrative inconsistencies are nearly enough to yield several issues of material fact by themselves.  (Mem. Opp'n Summ. J. 16.)  In his deposition given on December 8, 2021, Bynum states that, upon starting his shift, he learned from Lieutenant Daniels that Boley was scheduled to see a doctor the following day because he had fallen ill earlier.  (Bynum Tr. 105:1-12.)  However, in a handwritten incident report recorded immediately after Boley's death, Bynum recounts that it was Lieutenant A. Jones who informed him that Boley was sick.  (Investigation R. 18.)  In this handwritten incident report, Bynum says that he visited Boley in his cell, where Boley himself informed him that he was not well and that he wished to see a nurse.  (*Id.*)  However, when being deposed months later, Bynum testifies that Boley claimed that he was "all right" when asked about his condition during that same interaction.  (Bynum Tr. 115:24-25.)  Whatever the prior exchange, Bynum then called Nurse Hayes, who came to the Men's Work Center for a second time that day around 6:30 p.m.  (*Id.*)

While Nurse Hayes was present, Bynum claims that he witnessed her perform a second EKG on Boley, though there is no record of that procedure being done in the evening, including from reports and testimony from Hayes herself.  (*See* Bynum Tr. 135:3-11.)  Moreover, Nurse Hayes asserts that she was alone with Boley when she visited him in the evening to administer his second dose of medication.  (Hayes Tr. 206:12-207:2, ECF No. 82-9.)  A reasonable juror could

assess, despite these inconsistencies, that Bynum was aware that Boley required medical attention, including medical attention related to chest pains, and that he was feeling unwell throughout the evening hours.  During a briefing, Bynum also informed other corrections officers on duty, one of whom was Defendant Guy, that Boley was ill.  (Bynum Tr. 126:2-127:24; *see also* Mem. Opp'n Summ. J. 15-16.)  Bynum admits to receiving some half a dozen phone calls from Boley's family on the evening of April 16, informing Bynum that Boley was ill and needed medical care.  (Mem. Supp. Summ. J. 7.)  Viewed together, his interactions with Nurse Hayes, conversations with Boley's family, and conversation with Boley himself represent more than enough evidence for a jury to believe that Bynum was sufficiently aware of Boley's condition and his desire to seek medical assistance for it.

A jury may also determine that Bynum's actions demonstrated a shocking degree of negligence when he failed to contact emergency services for Boley in the face of multiple requests and indicia of serious illness.  Although Bynum did exercise some care by contacting Nurse Hayes in his first encounter with Boley, Bynum's alleged inaction in response to Boley's continuing needs makes a jury finding of gross negligence possible.

Prison officials are "entitled to rely upon their health care providers' expertise" especially where "everything in the record suggests that the wardens closely monitored [the inmate's] health and ensured that [he] received medical treatment." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990).  However, that statement does not apply to these circumstances.  Here, Plaintiff presents evidence that Boley was not closely monitored, particularly during the late evening and overnight hours.  Plaintiff disputes statements that Bynum checked on Boley in the early morning rounds of April 17, and points out that Bynum himself did not report this check-in in his written statements to authorities shortly after Boley's death.  (Pl.'s Ex. D 11-12, 28.)  Critically, it is not disputed that

Bynum received numerous calls from Boley's brothers concerning his health, that Bynum spoke to Boley who expressed that he was "sleepy" and asked about the effects of heartburn, and that Bynum did not call for medical assistance after those conversations. (Bynum Tr. 86:2-13, 87:6-11; Investigative R. 6.) Finally, inmate Reggie Flowers asserts that Bynum responded to Boley's requests to go to a hospital by asserting that "they could not get an ambulance because they were short staffed that day" and did not make further efforts to ensure Boley could go to the hospital. (Pl.'s Ex. A 2.) Because of the potential seriousness of chest pain, the repeated pleas from Boley's family, and the disputed evidence surrounding Bynum's actions on the evening of April 16 and the early morning of April 17, a factfinder could determine that Bynum failed to provide some degree of care to Boley after Nurse Hayes left the prison. As explained in the Court's Memorandum Opinion on Defendants' Motion to Dismiss, officers cannot avoid responsibility solely because Boley saw a nurse earlier in the day. (*See Boley v. Armor Correctional Health Services, Inc.*, 2:21-CV-197, 22 WL 905219, at \*7 (E.D. Va. March 28, 2022).)

### 2. Defendant Guy

Plaintiff presents affidavits and testimony that Defendant Guy was aware, or should have been aware, that Boley required medical attention due to persistent chest pains. Upon starting his shift, Bynum informed Guy that Boley had fallen ill that day. (Bynum Tr. 126:2-127:24; *see also* Mem. Opp'n Summ. J. 15-16.) Several inmates claim to have implored Guy to check on Boley, with at least one emphasizing that he needed emergency medical care. (Pl.'s Ex. A 2-3, 6; *see also* Guy Tr. 75:21-76:24, ECF No. 61-6.) Moreover, Guy was partly responsible for performing rounds, and thus should have seen Boley's discomfort and frustration as described by his fellow inmates. (*See* Pl.'s Ex. A, 2-3.) Reggie Flowers alleges that, in response to hearing that Boley's chest was "really tight," Guy reiterated Bynum's explanation that the prison was short staffed and

that they were trying to work within the chain of command to get Boley to the hospital.  (*Id*.)  Guy himself admits in a deposition that "I think one or two [inmates] said [Boley] fell out," but further explains that "inmates are going to talk, and they try to get you to look in different directions so they can do what they want to do."  (Guy Tr. 49:24-50:13.)  Approximately an hour before Guy was on his shift, an unidentified officer logged an interaction with Boley that read, "Checked on Offender Boley.  Still in pain . . .."  (*See* Guy Tr. 64:15-25, ECF No. 82-3; *see also* Investigative R. 27.)

Evidence of Guy's responses to Boley's health concerns is also disputed.  Defendants contend that Guy "checked on Boley throughout the night and spoke with him to ascertain his wellbeing."  (Mem. Supp. Summ. J. 17.)  Plaintiff, on the other hand, alleges facts that paint Bynum as distracted, prone to discredit the concerns of inmates, and possibly derelict in some of his duties.  (Mem. Opp'n Summ. J. 20-22.)  Although Guy recalls in a deposition that he witnessed Boley "sitting up, watching TV. . . drinking water" when he checked on him during rounds (Guy Tr. 75:9-17), in his report to investigators, Guy wrote that the last time he observed Boley moving around was when "Bynum asked him to send Boley to the watch office" around 9:15 or 9:30 p.m. (Investigative R. 14, 27.)  He then stated that he observed Boley laying down during the 11:45 p.m. and 3:00 a.m. counts.  (*Id.* 14.)  Plaintiff's witness Carlos Wilson questions whether Guy actually made the 11:45 p.m. round, asserting that Guy did not make rounds between 8:00 p.m. and midnight.  (Pl.'s Ex. A 10.)  Inmate David Copeland also claims that he did not see any officers make rounds after 11:00 p.m.  (Copeland Tr. 56:1-11.)  Guy admits that he "had a lot going on at that time" but does not recall any specific events that evening that contributed to his busyness. (Guy Tr. 64:3-14.)  When considered together, a reasonable juror could conclude that Guy felt that he was too busy or distracted to pay adequate attention to Boley's obvious needs.  More damning,

jurors could infer that Guy disregarded or discounted clear warnings about Boley's condition due to his existing assumptions about the believability of inmates.

In light of the inconsistences and disputes in the parties' material facts, the Court must draw inferences in favor of the nonmovant – here, the Plaintiff.  See *Anderson*, 477 U.S. at 255.  Given this mandate, the Court denies summary judgment to the Correctional Officer Defendants as to Count Two.

**B. Deliberate Indifference and Willful and Wanton Negligence**

The Court will analyze Count Three, Willful and Wanton Negligence, and Count Four, Violation of Civil Rights under 42 U.S.C. § 1983, together due to the close relationship of the elements of their respective legal standards. Movants, the Correctional Officer Defendants, argue that Boley's condition was not so obvious that a lay person would easily recognize the need for medical attention, that neither Defendant knew or inferred that Boley was at risk of serious harm, and that both Defendants responded reasonably to the risk presented.  (Mem. Supp. Summ. J. 13-16.) Plaintiff asserts that Bynum and Guy had ample and obvious knowledge that Boley was in medical distress, that his condition posed a serious risk to his wellbeing, and that they failed to act reasonably in response to that knowledge.  (Mem. Opp'n Summ. J. 13-22.)

The Court notes that much of Defendants' argument asks the Court to disregard the prisoners' affidavits as not credible.  The Court cannot and will not make this inference.  Only the trier of fact can assess the truthfulness of an affidavit, and the credibility of Plaintiff's evidence must be assumed.  *Cf. Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979) (summary judgment is inappropriate when affidavits require credibility determinations); *see also Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  The Court therefore proceeds with this analysis by giving prisoner's statements equal weight as all other evidence presented by the parties.

14

*1. Denial, Delay, and Withholding of Medical Care in Violation of the Eighth and Fourteenth Amendments*

The Eighth Amendment's protection against cruel and unusual punishment is violated when officials exhibit "deliberate indifference to serious medical needs of prisoners." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In the context of inadequate medical care, there is an objective and a subjective element. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). "The plaintiff must demonstrate that the [defendant] acted with deliberate indifference (subjective) to the inmate's serious medical needs (objective)." *Id.*; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A medical condition is objectively serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241. To establish the subjective element, the plaintiff must show that "the official subjectively knew of and disregarded an excessive risk to the inmate's health or safety." *Moran*, 1 F.4th at 302 (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). "A deliberately indifferent state of mind can be proven through 'inference from circumstantial evidence.'" *Thompson v. Commonwealth*, 878 F.3d 89, 108 (4th Cir. 2017) (*quoting Farmer*, 511 U.S. at 842).

"Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Moran*, 1 F.4th at 303 (*quoting Farmer*, 511 U.S. at 835). "[P]rison officials who actually knew of a substantial risk to inmate health and safety may be found free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844. The treatment provided "must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Moran*, 1 F.4th at 303 (*quoting Miltier v. Beorn*, 896 F.2d 848, 851 (4th

Cir. 1990)).  To establish a claim of deliberate indifference against non-medical prison staff, a plaintiff must show that the non-medical personnel (1) were personally involved in the treatment or denial of treatment, (2) deliberately interfered with treatment, or (3) tacitly authorized or were indifferent to the medical provider's conduct.  *Howell v. Walrath*, No. 1:20cv1193, 2021 WL 5881803, at *5 (E.D. Va. Dec. 10, 2021); *Hill v. Richmond Justice Ctr.*, No. 1:20cv467, 2021 WL 1428311, at *3 (E.D. Va. Apr. 15, 2021).  To satisfy the subjective prong, the plaintiff must show that defendant had "actual knowledge of the risk of harm to the inmate" and the defendant "must also have 'recognized that his actions were insufficient' to mitigate the risk of harm to the inmate arising from his medical needs.'"  *Iko*, 535 F.3d at 241 (*quoting Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

Several courts have determined that chest pain satisfies the objective prong of the deliberate indifference standard.  *See, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) ("[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard."); *Melvin v. Cty. of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *5 (S.D.N.Y. Mar. 29, 2016) (finding that defendant's complaints of chest pain coupled with high blood pressure and a low pulse satisfied the objective prong); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1310 (D. Colo. 2009) (finding that the plaintiff's allegation of suffering chest pain over a several hour period satisfied the objective element of the test).  Critically, several laypersons recognized that Boley suffered from a serious medical condition requiring immediate attention.  Inmates Reggie Flowers, Marese Francis, Carlos Wilson, and David Lee Copeland each expressed concerns about Boley's wellbeing and believed that he required a trip to the hospital.  (*See* Pl.'s Ex. A 2, 6, 9; *see also* Copeland Tr. 23:10-13.)  Plaintiff presents evidence that Bynum and Guy each understood that Boley's condition might

require an ambulance, but "claimed that they could not get an ambulance because they were short staffed that day." (Pl.'s Ex. A 2.) Finally, although disputing his personal knowledge of Boley's severe chest pains, Defendant Bynum recognized that chest pains are "serious" and admitted that if inmates present with such pain "they get sent to the hospital." (Bynum Tr. 193:5-15; Mem. Supp. Summ. J. 8.) Boley's complaints of and presentation with severe and persistent chest pain qualify as a serious medical condition in satisfaction of the objective prong. The Court now separately analyzes whether a reasonable factfinder could determine that the behaviors of Defendant Bynum and Defendant Guy fulfill the subjective prong of the test.

### a. Defendant Bynum

The Court finds that there are genuine issues of material fact that preclude summary judgment on Count Four, deliberate indifference, with respect to Defendant Bynum. As discussed earlier, the fact the Bynum did not act with deliberate indifference in his earliest interactions with Boley on April 16 does not necessarily mean that his lack of action in the face of persisting symptoms is legally excusable under § 1983. In *Sosebee v. Murphy*, the Court found that, although corrections officers did not at first act with deliberate indifference to an inmate's medical needs when they provided prompt attention to his symptoms, they could still be liable under deliberate indifference when they later failed to provide immediate medical attention as the inmate's condition escalated. 797 F.2d 179, 182 (4th Cir. 1986). In overturning the district court's grant of summary judgment to the prison officials, the appellate court emphasized that the guards saw and spoke with the sick inmate, expressed their awareness of his condition to other prisoners, and told some prisoners that nothing could be immediately done for the inmate, laughed about his condition and threatened prisoners advocating for the inmate with solitary. *Id.*

In contrast, in *Miltier v. Beorn*, an inmate complaining of chest pains, shortness of breath, and other symptoms, was immediately transferred to a medical unit where nurses provided round-the-clock monitoring and care.   896 F.2d at 851.   After several evaluations by medical professionals, the inmate was relocated back to general population, despite lack of complete diagnostic testing and telephone calls from her mother pleading for her care.   *Id*.   The inmate eventually died in prison due to her untreated heart disease.   *Id*.   The appellate court found that there was no basis for liability against rank-and-file corrections officers because "there [was] simply no evidence that they were made aware of any complaints" within the year that the inmate died.   *Id*. at 855.

The present case more closely resembles *Sosebee* than *Miltier*.   Here, it is not disputed that the outgoing watch commander informed Bynum that Boley felt unwell and that he "fell ill in the hallway" earlier in the day.   (Bynum Tr. 105: 5-23.)   Bynum interacted with Boley during a time period when Boley's fellow inmates described him as lamenting about his chest pain, moving about gingerly, and holding his chest.   (*See* Pl.'s Ex. A 1, 2, 6, 9; Pl. Ex. G 29:7-9.)   Like in *Sosebee*, Bynum allegedly spoke to other prisoners about Boley's condition while tacitly acknowledging that a hospital visit could be appropriate.   (Pl.'s Ex. A 2.)   Finally, Bynum received around six separate telephone calls from Boley's family expressing concern about Boley's wellbeing.   (Bynum Tr. 155:5-25.)   According to brothers James and Michael, Bynum came across as dismissive and uncaring over the phone.   (J. Boley Tr. 31:7-14; M. Boley Aff. 2.)   Unlike in *Miltier*, Plaintiff presents evidence that Bynum was made aware, time and time again, of complaints from Boley and on his behalf.   *See also Caramillo v. Correct Care Solutions, LLC*, 2020 WL 4747786, at *15 (E.D. Va. Feb. 28, 2020) (denying deputies' motion to dismiss because

corrections officers were made aware of complaints prior to inmate's death and were not closely monitoring inmate).

Defendants argue that this case is not like *Sosebee* because, here, Bynum and Guy did not witness Boley's condition worsen throughout the evening.  (*See* Mem. Supp. Summ. J. 15.) However, the *Sosebee* Court did not rule against the officers because they witnessed a worsening condition, but rather because that escalation in illness made the inmate's fragile medical state increasingly obvious to the defendants.  *See Sosebee*, 797 F.2d at 182.  In the present case, the obviousness of Boley's condition to Bynum is exactly the issue in dispute.  Because Bynum's knowledge of Boley's condition and his actions in response to that supposed knowledge are disputed, denial of summary judgment as to Bynum is the only appropriate option for the Court.

### b. Defendant Guy

Much like his co-defendant Bynum, Plaintiff presents evidence that multiple people informed Guy that Boley was unwell.  At some point during his shift, Guy spoke directly with Boley, though the parties do not agree about the content of that conversation.  (*See* Mem. Supp. Summ. J. 9; Copeland Tr. 49:19-24, 129:14-22; Pl.'s Ex. A 2.)  Plaintiff asserts that Boley informed Bynum that his chest was tight and that he needed to go to a hospital.  (Pl.'s Ex. A 2.) Plaintiff alleges that Guy responded by saying that the prison was short staffed, and that officers were trying to work up the chain of command to get Boley to the hospital.  (*Id*.)  Other inmates claim, and Guy admits, that they asked him to check on Boley's health. However, Guy discounted their concerns due to his doubts about their truthfulness and motives.  (Guy Tr. 49:24-50:13.) Finally, Guy's participation in mandated rounds and security checks is disputed by at least one inmate. (Mem. Opp'n Summ. J. 9.)

Construing all inferences in favor of the nonmovant, a jury could find that Defendant Guy was actually aware of Boley's serious medical condition but cast that knowledge aside due to his lack of faith in the inmates, his own busy schedule, or a concern for the convenience of the facility that outweighed his concern for the safety of the decedent.  The Court denies summary judgment on Count Four as to Defendant Guy.

### 2. *Willful and Wanton Negligence*

Willful and wanton negligence is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct would likely cause injury to another." *Cowan*, 603 S.E.2d at 918-19 (internal quotations and citations omitted).  It is the most extreme level of negligence under Virginia law. *See id*.  It requires "more than inattention and neglect." *Doe v. Baker*, 857 S.E. 2d 573, 588 (Va. 2021).  Willful and wanton negligence is distinguished from ordinary or gross negligence by the defendant's "actual or constructive consciousness that injury will result from the act done or omitted." *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999).

Under Virginia law, the standard for willful and wanton negligence closely mirrors the subjective prong of the deliberate indifference test. *Hixson v. Hutcheson*, 5:17-CV-00032, 2018 WL 814059, at *9 (W.D. Va. Feb. 9, 2018).  Because the Court denied summary judgment to the Defendants on both the objective and subjective prongs of the deliberate indifference standard, the Court also denies summary judgment on the similar but diminished count of willful and wanton negligence as to both Defendants.

## V. CONCLUSION

For the foregoing reasons, the Court will deny the Correctional Officer Defendants' Motion for Summary Judgment on Counts Two, Three, and Four of the Complaint as to Sergeant Emmanuel Bynum and Officer Joel Guy.

An appropriate Order shall issue.

_____ /s/

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: November 15, 2022