IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JAMES A BOLEY, JR., *Administrator of*   )
*the Estate of Robert Lee Boley*,   )
     Plaintiff,   )
  )
     v.   )      Civil Action No. 2:21CV197 (RCY)
  )
ARMOR CORRECTIONAL HEALTH   )
SERVICES, INC., *et al.,*   )
     Defendants.   )
  )

## **MEMORANDUM OPINION**

This matter is before the Court on Defendant Emmanuel Bynum's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial ("Bynum JMOL Motion," ECF No. 182), Defendants Armor Correctional Health Services, Inc.'s and Arleathia Peck's ("Armor Defendants")[1] Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial ("Armor Defendants' JMOL Motion," ECF No. 199), and the Armor Defendants' Motion to Alter, Amend, or Correct Judgment (ECF No. 196). The Motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are fully developed, and argument would not aid the Court in its decisional process. E.D. Va. Loc. Civ. R. 7(J). Because all defendants have failed to meet their burden to set aside the jury's verdict, the Court will deny Defendants' motions for a new trial and for judgment as a

---

[1] Plaintiff did not pursue direct liability against Armor Correctional Health Services, Inc., but rather based his claims on a theory of vicarious liability. In Virginia, claims for vicarious liability under the doctrine of respondeat superior and claims for direct liability against an employer are distinct. *Parker v. Carilion Clinic*, 819 S.E.2d 809, 823–24 (Va. 2018). An employer can be vicariously liable for the tortious acts of its employee, provided that the employee was performing the employer's business and acting within the scope of his employment at the time. *Id.* at 819 (citing *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)).

matter of law.  The Court will, however, grant the Armor Defendants' Motion to Alter, Amend, or Correct Judgment.

## I. FACTS

On April 17, 2019, Robert Boley ("Boley"), an inmate at Deerfield Men's Work Center ("Deerfield" or "Men's Work Center"), was found dead in his cell from a ruptured aortic aneurism. His brother and beneficiary, James Boley ("Plaintiff"), filed this civil rights and medical malpractice litigation against Defendants Emmanuel Bynum and Joel Guy, both correctional officers at the facility, and against Defendants Armor Correctional Health Services, Inc., Alvin Harris, M.D., and Arleathia Peck, LPN.  Following a five-day jury trial, the jury found for Plaintiff on Plaintiff's negligence and gross negligence claims against Nurse Peck, for which Armor was vicariously liable, and on Plaintiff's gross negligence claim against Defendant Bynum. Defendants Guy and Harris were not found liable on any counts.  The jury awarded damages in the amount of $4,000,000.  The instant motions followed.  This action involves a lengthy and complex factual and procedural history that has been fully produced in the Court's prior opinions. Only the facts pertinent to the present motions are produced herein.

### A. Boley Interacts with Nurse Peck

In the morning of April 16, 2019, Robert Boley, an inmate at the Deerfield Men's Work Center, began experiencing chest pains while in the recreation area.  Sometime in the afternoon, Boley sought medical attention from the nurse on duty at the Men's Work Center.  According to witnesses Marese Francis and Carlo Wilson and records from the prison, Defendant Nurse Peck was the nurse on duty when Boley sought assistance.  *See* Tr. 400:20–24; Tr. 440:18–19; Tr. 730:19–21.  During trial, Plaintiff presented evidence that Nurse Peck, who was at or approaching the end of her work shift, refused to examine Boley, instead telling him that he needed to submit

a medical slip for sick call.  Tr. 400:22–24; Tr. 728:2–16.  Boley later told his brother James that a nurse gave him "the brush off game" when he sought treatment earlier in the day.  Tr. 325:15–20.  Nurse Hayes, who examined Boley shortly after the end of Nurse Peck's shift, seemingly confirmed this account in her records, which indicated that Boley informed her that he was turned away from medical earlier in the day.  Tr. 600:18–601:4.

Shortly after Boley's encounter with Nurse Peck, Nurse Hayes was called to the Men's Work Center in order to assess Boley's condition.  Tr. 514:2–9.  Upon taking his vitals, she found that Boley had a blood pressure of 66/48 and a pulse of 60 beats per minute.  Tr. 468:3–4; 513:5–7.  Nurse Hayes contacted the on-duty physician, Defendant Dr. Harris.  At his request, she re-took Boley's vitals (which had since improved) and performed an EKG, which appeared to be borderline abnormal.  Tr. 516: 15–16.  She read the results of the EKG to Dr. Harris over the phone.  Tr. 529:7–19.  Based on this information, Dr. Harris opted against sending Boley to the emergency room and instead diagnosed him with acid reflux and scheduled an appointment for him to be seen the following morning.  Tr. 521:8–522:2; 523:6–8; 577:7–11; and 580:1–3.

During trial, Plaintiff's expert witness, Nurse Lori Roscoe, PhD, testified that Nurse Peck's actions significantly deviated from the standard of care when she instructed Boley "to put a complaint of chest pain as a sick call slip in the box."  Tr. 589:16–18.  As Nurse Roscoe was not certified as a causation witness, she offered no opinion about causation as it relates to Nurse Peck.  Plaintiff's causation experts, physicians Dr. Rishi Kundi and Dr. William Bethea, testified that Mr. Boley likely would have survived if he had been sent to the emergency room in the afternoon or evening of April 16.  See Tr. 631:1–6; 632:18–21; 639:18–640:3; 700:1–7.

**B. Officer Bynum's Shift**

Defendant Bynum, the watch commander, arrived at Deerfield for his overnight shift at or about 5:00 p.m.  Upon arriving at Deerfield, an outgoing correctional officer informed him that Boley was to see a doctor in the morning because he had fallen ill during the day.  Plaintiff's first witness, Reggie Flowers, one of Boley's fellow inmates in his block, testified that he spoke with Bynum multiple times, urging him to secure emergency medical care for Boley.  Tr. 199:12–15.  Flowers testified that Bynum said that the prison was understaffed and that he was trying to call the main prison facility to secure help.  Tr. 195:22–23.  Although Flowers testified that he had multiple conversations about Boley's condition with Bynum, Bynum disputed this and claimed that he would not discuss one inmate's health with another inmate.  Tr. 1070:13–17.  At Boley's request, Bynum called Nurse Hayes back to the Men's Work Center in the early evening.  She assessed him again and gave him another dose of Mylanta.  Boley then returned to the housing unit.

Around 9:46 p.m., Boley called his brother James.  *See* Tr. 374:7–14; Tr. 821:11; Tr. 701:20–702:3.  The location of this call is disputed.  During the call, Boley described his pain as severe and prolonged and asked about the severity of pain associated with acid reflux.  Pl. Trial Ex. 9.  After the call, Boley returned to his cell, and a subsequent security check performed by Officer Guy found him lying down in bed.  At approximately 5:30 a.m. on April 17, 2019, officers conducting rounds found Boley sitting up in his cell, unresponsive.  Tr. 847:9–10.  Shortly thereafter, he was pronounced dead.  His official cause of death was a ruptured aortic aneurysm due to hypertensive and atherosclerotic cardiovascular disease.  Tr. 847:15–21.

## II. PROCEDURAL HISTORY

Plaintiff James Boley, brother of the decedent Robert Boley, filed a four-count Complaint on April 14, 2021, alleging negligence (as to Defendants Harris and Peck only), gross negligence, willful and wanton negligence, and federal civil rights violations under 42 U.S.C. § 1983 (ECF No. 1). Defendants Armor Correctional Health Services, Inc. ("Armor"), Nurse Arleathia Peck, and Dr. Alvin Harris (collectively, "the Armor Defendants") filed an Answer to the Complaint on July 7, 2021. (ECF No. 10.) Defendants Emmanuel Bynum and Joel Guy (collectively, "the Correctional Officer Defendants") filed a Motion to Dismiss for Failure to State a Claim on July 28, 2021. (ECF No. 23.) The Court denied the Correctional Officer Defendants' Motion to Dismiss as to all counts of the Complaint on March 28, 2022. (ECF Nos. 50–51.) On April 19, the Armor Defendants filed a Motion for Summary Judgment and a Memorandum in Support (ECF No. 64–65); the Correctional Officer Defendants likewise filed a Motion for Summary Judgment on accompanying memorandum on April 21, 2022 (ECF Nos. 60–61). On November 15, 2022, the Court issued separate opinions denying both Motions for Summary Judgment as to all defendants on all counts. (ECF Nos. 122 and 124.)

The Court held a Final Pretrial Conference for all parties on November 17, 2022. On November 22, Plaintiff's counsel informed the Court and counsel for the Defendant that Plaintiff intended to withdraw the willful and wanton claims (Count III) against all defendants, to which there were no objections. The five-day trial in this matter commenced on December 5, 2022. On December 7, the third day of trial, the Court granted the Armor Defendants' motion to strike testimony of Marese Francis that concerned Defendant Nurse Peck's character and reputation. The Court subsequently issued a limiting instruction to the jury. The parties' joint stipulations of fact were read into the record. Following the reading of the stipulations, Plaintiff rested his case.

Outside of the presence of the jury, both Armor Defendants and Correctional Officer Defendants subsequently made and argued oral motions for judgment as a matter of law.  Finding that Plaintiff had produced evidence on each element of Counts One, Two, and Four, the Court denied both motions.  *See* Tr. 869:1–18.  Both sets of Defendants concluded their cases and rested on December 8, the fourth day of trial.  Out of the presence of the jury, Defendants renewed their oral motions for judgment as a matter of law, which the Court denied.  After closing arguments and deliberations on December 9, 2022, the jury returned a verdict finding that Nurse Peck was negligent and grossly negligent, finding that Bynum was grossly negligent, and awarding damages to Plaintiff in the amount of $4,000,000.00.  (ECF No. 158.)  The jury did not award prejudgment interest.  (*Id.*)  After the reading of the verdict, Counsel for Armor Defendants made an oral motion to reduce the damages award pursuant to Virginia's statutory medical malpractice cap.  The Court ordered briefing on the motion.  (ECF No. 162.)

The Armor Defendants filed a brief in support of their oral motion to reduce damages on December 14, 2022 (ECF No. 163).  On January 3, 2023, the Court denied Armor's Motion to Reduce Damages insofar as a blanket-reduction, but directed that, per Va. Code § 8.01-581.15, Plaintiff may not recover from Defendants Nurse Peck and Armor in excess of $2.1 million, plus post-judgment interest in the amount dictated by 28 U.S. Code § 1961.  (ECF No. 171.)  On January 6, 2023, Defendant Bynum filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, a Motion for a New Trial and an accompanying memorandum of support (ECF Nos. 182, 183).  Plaintiff filed its Memorandum in Opposition to the Motion on January 20 (ECF No. 193), and Defendant Bynum replied on January 26, 2023 (ECF No. 194).  On February 1, 2023, Defendants Armor and Peck filed a Motion for Judgment as a Matter of Law, or in the Alternative, a Motion for a New Trial, as well as a memorandum in support of the motions.  (ECF Nos. 199,

200.)  Plaintiff filed a Memorandum in Opposition on February 15 (ECF No. 204), and Defendants Armor and Peck replied on December 21 (ECF No. 205).  On February 1, 2023, Defendants Armor and Peck also filed a Motion to Alter, Amend, or Correct Judgment (ECF No. 196), and Plaintiff filed a response on February 13, 2023 (ECF No. 203).

### III. LEGAL STANDARD

Judgment as a matter of law under Federal Rule of Civil Procedure 50 may only be granted where "there can be but one reasonable conclusion as to the proper judgment." *Volvo Cars of N. Am. LLC v. United States*, 571 F.3d 373, 381 (4th Cir. 2009).  *See also Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) ("A trial court may not appropriately enter [JMOL] unless it concludes, after consideration of the record as a whole in the light most favorable to the nonmovant, that the evidence presented supports only one reasonable verdict, in favor of the moving party.")  A movant is entitled to a judgment as a matter of law "if the nonmoving party failed to make a showing of an essential element of his case with respect to which he had the burden of proof." *Bilenky v. Ryobi Technologies, Inc.*, 115 F.Supp.3d 661, 668 (E.D. Va. 2015), *quoting Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995).  If the Court declines to grant a motion for judgment as a matter of law made during the course of a jury trial, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  On a renewed motion for judgment as a matter of law, the essential question becomes whether the substantial evidence supports the jury's findings.  *Id*.  In determining whether a party is entitled to a judgment as a matter of law, the Court may not weigh the evidence or make credibility determinations.  *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 150 (2000); *see also Bongam v. Costco Wholesale Corp.*, 125 Fed.

App'x. 464, 464 (4th Cir. 2005) (finding that judgment as a matter of law was not appropriate because plaintiff's testimony was subject to more than one interpretation).

In order for the Court to consider a renewed motion for judgment as a matter of law under Rule 50(b), the movant must have first raised a Rule 50(a) motion prior to submission of the case to the jury. *Smith v. University of North Carolina*, 632 F.2d 316, 338-39 (4th Cir. 1980); *see also Tidewater Finance Co., Inc. v. Fiserv Solutions, Inc.*, 4 Fed. App'x. 201, 204 (4th Cir. 2001). That renewed motion for judgment as a matter of law must "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Fed. R. Civ. P. 50(a)(2). Such language must state the particular grounds for the motion and the movant may only base it upon the particular ground raised in the earlier Rule 50(a) motion at the close of evidence. *Sloas v. CSX Transp., Inc.*, No. 3:07-0504, 2009 WL 192568 at *1 (W.D. Va. 2009). This requirement exists to ensure that the court and non-moving party have been appraised of any deficiencies in proof, and to provide the opposing party an opportunity to correct those deficiencies. *Id*.

Under Federal Rule of Civil Procedure 59(a), a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). The Fourth Circuit has interpreted this Rule to mean that "the district court must set aside the verdict and grant a new trial if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (internal citation omitted). "The decision to grant or deny a new trial is within the sound discretion of the district court." *Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301* (4th Cir. 1998).

As an alternative to ordering a new trial, a court may order a remittitur.  Remittitur is a legal principle that permits a trial court to order a new trial unless the plaintiff accepts a reduction of a jury award that the Court has deemed to be excessive.  *See Cretella v. Kuzminski*, 640 F.Supp.2d 741, 756 (E.D. Va. 2009); *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 438 (4th Cir. 2004).  Thus, with remittitur "the Court does not order that the damage award is reduced; instead, the court gives the plaintiff the option of accepting a reduced amount or trying the case over."  *G.M. Garrett Realty, Inc. v. Century 21 Real Estate Corp.*, 17 Fed. App'x. 169, 173 (4th Cir. 2001).  "There is no specific provision for remittitur under the Federal Rules of Civil Procedure, but it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice."  *Bennett v. Fairfax Cnty.*, 432 F.Supp.2d 596, 599 (E.D. Va. 2006).  Remittitur is restricted to circumstances clearly identified by the controlling state authority, which here is the Virginia Supreme Court.  Under Virginia Supreme Court precedent, a trial court may set aside a verdict because it is excessive if "the amount shocks the conscience of the court" either because the jury was motivated by passion, corruption or prejudice, or has misconstrued the law, or because the award is "so disproportionate to the injuries suffered as to suggest that it is not the product of a fair and impartial decision."  *Cretella*, 640 F. Supp. 2d at 756 (quoting *Government Micro Resources, Inc., et al. v. Jackson*, 624 S.E.2d 63 (2006)).  If the Court determines that a jury verdict is excessive, the court must order remittitur or a new trial.  *Id.*  The decision as to whether damages are excessive is entrusted to the discretion of the trial court.  *Robles v. Prince George's Cnty.*, 302 F.3d 262, 271 (4th Cir. 2002).

## IV. ANALYSIS

In their respective filings, both Defendant Bynum and Defendant Peck sought multiple forms of post-trial relief, including Judgment as a Matter of Law, a new trial, and remittitur.  In

the interest of clarity, the Court considers in turn all forms of relief sought by Bynum before turning to the relief sought by Peck.

**A. Defendant Bynum**

### 1. Judgment as a Matter of Law

Defendant Bynum contends that Plaintiff failed to present evidence that was legally sufficient to carry the burden of proving gross negligence. Bynum asserts that the evidence at trial did not prove that he engaged in the type of "[d]eliberate conduct" evincing "the 'utter disregard of prudence amounting to complete neglect of the safety of another'" that is required to find liability for gross negligence. (*See* Bynum Mem. Supp. JMOL 11, ECF No. 183, *quoting Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 800–01 (1996) (*quoting Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (1987))). Rather, Bynum claims, Plaintiff did not offer evidence that Bynum was even aware of Boley's worsening symptoms indicative of a medical emergency. *Id*. 12. Bynum further asserts that he "exercised some care" by contacting Nurse Hayes and asking that his staff monitor Boley and report any changes. Taken together, Bynum's alleged lack of knowledge and his exercise of some degree of care would, Bynum argues, render unreasonable any jury finding of liability for gross negligence.

In response, Plaintiff argues that he presented evidence of phone calls and conversations with other inmates that pointed to Bynum's knowledge of Boley's condition, and that any evidence of Bynum's subsequent response to that knowledge was disputed during trial. Claiming that, at trial, Bynum's testimony "contained repeated inconsistencies," Plaintiff asserts that the jury did not believe his testimony to be credible and adopted Plaintiff's version of events. (Mem. Opp'n. JMOL Bynum 2, ECF No. 193.)

In Virginia, gross negligence is the "degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliot v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (*quoting Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918–19 (Va. 2004)).   Gross negligence requires "a degree of negligence that would shock fair-minded persons." *Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021) (*quoting Cowan*, 603 S.E.2d at 918).   The standard is one of "indifference, not inadequacy." *Fijalkowski v. Wheeler*, 801 F. App'x 906, 914 (4th Cir. 2020) (*citing Elliot*, 791 S.E.2d at 732). Therefore, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care. *Id.*

A claim for gross negligence requires a lesser showing of recklessness than a claim of deliberate indifference, a count against Bynum on which the jury declined to find liability. *Hixson v. Hutcheson*, 5:17-CV-00032, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018).   "Unlike deliberate indifference, gross negligence does not require a juror to find that [the defendant] subjectively knew of a substantial risk; it is enough that [the defendant] should have been aware of that risk." *Coppage v. Mann*, 906 F. Supp. 1025, 1049 (E.D. Va. 1995).   Thus, Boley was required to show that Bynum had a legal duty to Boley, that he breached that duty in a manner that would shock fair-minded persons, and that such breach was a proximate cause of the resulting injury. *Locke v. Johns-Manville Corp.*, 275 S.E.2d 900, 904 (1981); *Doe*, 857 S.E.2d at 587. However, Boley need not show that Bynum was certain of the gravity of his medical condition.

The Court finds that Plaintiff presented sufficient evidence such that persons of reasonable minds could determine that Defendant Bynum was grossly negligent. *See Frazier*, 362 S.E.2d at 691.  Multiple witnesses testified that Bynum was aware of Boley's condition, acknowledged its severity, and demonstrated indifference to Boley's immediate medical needs.  Mr. Flowers, then

an inmate residing in the same wing as Boley, testified that he engaged Bynum in several conversations about Boley and his condition. Flowers testified that Boley constantly complained of chest pains throughout the evening of April 16, well after the start of Bynum's shift. Tr. 192:1– 2 (ECF No. 184). Along with other inmates, Flowers suggested that an ailing Boley "…lay in front of [the master control booth] and make [prison staff] get you some help." *Id*. 193:5–7. Flowers recounted how he then approached Bynum at his station and informed him that Boley was experiencing chest pain and needed to go to the hospital. *Id*. 195:17–20. According to Flowers, he personally informed Bynum of Boley's immediate need for medical attention two or three times the evening before his death, with Bynum relaying that he was seeking resolution each time. *See id.* 199:12–15; 24:21–23. No party, however, presented evidence that Bynum actually sought such resolution.

A jury might interpret Flowers' testimony in several ways. Among their options is the belief that Bynum was unaware of the severity of Boley's illness but nonetheless sought ways to provide Boley treatment. Another is the reasonable inference that Bynum both personally bore witness to Boley's acute chest pains and was informed of their severity by several inmates, and opted against securing access to urgent care, whether that was due to staffing and protocol concerns as he testified, or due to some other reason. At trial, the jury appears to have believed the latter scenario. It is not this Court's prerogative to decide to which interpretation the jury should adhere.

Further, witness James Boley testified that he spoke to Bynum on the phone, reminding him that "chest pains are serious" and imploring him to call medical aid for his brother Robert Boley. Tr. 315:13–18; 316:10 (ECF No. 185). On the stand, Boley described Bynum's tone on the phone call as "dismissive." *Id*. 316:13–17. Michael Boley echoed these sentiments, characterizing Bynum as "rude" and "agitated" during his own phone calls with him that evening.

Tr. 836:9–13 (ECF No. 186).  The observations of the Boley brothers constitute evidence that the jury could reasonably interpret to show Bynum's indifference to Robert Boley's serious medical needs.

Defendant Bynum asserts that he did not know of Boley's worsening condition, pointing out that he could rely on the knowledge of medical personnel in assessing Boley's medical risk. Bynum uses Flowers's testimony that he believed Boley "was okay" after his examination as an indicator that "a reasonably prudent person, with knowledge of the circumstances, could not have foreseen the consequences of not sending Boley to the hospital."  (Bynum Reply JMOL 6, ECF No. 194.)  It is true that prison officials are "entitled to rely upon their health care providers' expertise" especially when "everything in the record suggests that the wardens closely monitored [the inmate's] health and ensured that [he] received medical treatment." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990).  However, here Plaintiff offered evidence that prison officials failed to monitor Boley's health and respond accordingly, as well as evidence that Bynum himself understood that urgent care might be warranted, even absent consultation with healthcare providers.  If the jury were to believe Flowers's testimony, Bynum himself indicated that Boley could not travel by ambulance to the hospital due to staffing shortages, indicating that Bynum understood chest pains to be an ailment requiring urgent treatment.  Flowers, while present in the facility, lacked access to the same information, authority, and resources that Bynum possessed, and had to temper his own actions and interactions with authorities against his position as a fellow inmate within the institution.  Bynum had no such impediments.  The pleas of James and Michael Boley offer further evidence that Bynum knew of Boley's need for assistance.  Further, Officer Guy testified that, despite evidence that Boley was ill, Officer Bynum never recorded that he made

rounds in or entered the section of the prison where Boley stayed in order to check on him.  Tr. 1093:4–15 (ECF No. 187).

Critically, Plaintiff successfully impeached some of Bynum's testimony before the jury. As the Court instructed the jury, "a witness may be discredited or impeached by contradictory evidence or by evidence that at some time the witness has said or done something or has failed to say or do something that is inconsistent with the witness' present testimony." *See* Jury Instruction No. 21; Tr. 1143:13–19 (ECF No. 188).  A jury that perceives that a witness has been impeached can choose to distrust that witness's other testimony or otherwise discredit them.  *Id*. During trial and in pretrial filings, Bynum insisted that Boley called his brother from the Watch Office in the presence of Bynum and recalls that Boley told his brother James "that he was alright."  Tr. 1066:11–14.  Plaintiff provided a recording of the only known call between Robert and James Boley on the evening in question, and both parties stipulated that "[t]elephone calls initiated from, or received at, the Deerfield Men's Work Center Watch Commander's office cannot be recorded. The only recorded calls are from the inmate phones." Tr. 1062:6–9 (ECF No. 187).  Given this stipulation, Bynum's initial testimony that he heard the contents of the phone call between the Boley brothers, or that the call occurred in the watch office, is inconsistent with other evidence— even undisputed evidence—before the jury.  Thus, it is reasonable, in light of these testimonial inconsistencies and the weight of the other evidence, for a jury to discount Bynum's claim that Boley told him he was alright or his claim that Boley did not express the severity of his pain and discomfort.

As the movant, Bynum bears the difficult burden of establishing that the evidence presented at trial was insufficient.  The Court does not believe that Bynum has met his burden. Here, Plaintiff successfully presented evidence that Bynum had a duty to Boley, that he breached

that duty by failing to provide adequate care, that such a failure betrayed an utter disregard of prudence amounting to a complete neglect of Boley's safety, and that such inaction was a proximate cause of Boley's death.  While Defendant also presented viable evidence to the contrary, Plaintiff presented sufficient evidence for a jury to reasonably reach a conclusion in its favor, as it ultimately did.  As such, Defendant Bynum's Renewed Motion for Judgment as a Matter of Law will be denied.

### 2. Motion for a New Trial

As the Court has denied Defendant Bynum's Renewed Motion for Judgment as a Matter of Law, the Defendant seeks a new trial in the alternative.  Seeking a new trial on both liability and damages, Defendant Bynum argues that the jury's verdict was against the clear weight of the evidence, and that allowing the verdict to stand would result in a miscarriage of justice.  (Bynum Mem. Supp. JMOL 15–16.)  Bynum claims that the jury imposed an unrealistic standard of care on Bynum, finding that Bynum's inaction in failing to call for an ambulance was an action uncontemplated by other parties and witnesses in this action.  (*Id*. at 15.)  Further, Bynum argues, the time limits on the questioning of witness that the Court imposed on defense counsel mid-trial resulted in a disproportionate presentation of the evidence, and several of Plaintiff's counsel's statements in his closing were improper.  Taken together, Bynum argues, these circumstances resulted in an award of excessive damages.  (*Id*. at 16.)

Plaintiff counters that Bynum's Motion for a New Trial fails because there was more than sufficient evidence to find that Bynum "acted with a shocking disregard for Robert Boley's life." (Mem. Opp'n. JMOL Bynum 8.)  Plaintiff then accuses Bynum of lying "numerous times" and suggests that the Court may similarly discount Bynum's version of events just as the jury chose to do.  Id. Plaintiff further contends that Bynum was not prejudiced by the timing limitations placed

on the parties, pointing out that the limitations were reasonable based on the allocations of burdens of proof and persuasion and that all parties were limited by the restrictions. Finally, Plaintiff counsel disputes that he made any improper statements in his closing, pointing out that he made statements dissuading the jury from deciding based on sympathy and observing that Defense counsel did not object to any statements during his closing. *Id*.

The Court considers each of Defendant's arguments in turn.

### a. Clear Weight of the Evidence

The Court does not agree with Defendant Bynum that either the weight of the evidence, the Court's imposition of time limits, or any purported inappropriate statements by Plaintiff's counsel warrant a new trial. When considering whether to grant a motion for a new trial, the district court will consider, in part, whether the verdict is against the clear weight of the evidence. However, in light of the jury determination, the Court construes "clear weight" of the evidence as something more than mere preponderance of the evidence. *See PBM Products, LLC v. Mead Johnson & Co.*, No. 3:09-CV-269, 2010 WL 723739 at *4 (E.D. Va. 2010) (holding that, although movant had valid critiques of an expert witness's analysis, the fact that the analysis was reliable and data-based indicated that the verdict was not against the clear weight of the evidence); *Prichard v. Kurucz*, 22 Fed. App'x. 122, 125 (4th Cir. 2001) (finding that a jury verdict was not against the clear weight of the evidence despite movant's presentation of testimony and records in support of her position).

As the Court articulated in its discussion of Defendant Bynum's Motion for Judgment as a Matter of Law, Plaintiff offered sufficient evidence that Bynum was grossly negligent in his denial of care to Boley. The Court recognizes that the narrative presented by Defendant Bynum is plausible, and was presented in its entirety to the jury. However, its mere plausibility does not

obligate a jury to accept it over an alternative, equally plausible recounting of events from the Plaintiff.   Although the Court takes issue with Plaintiff's unnecessary and unproven characterization of Defendant Bynum as a liar, it also recognizes the myriad inconsistencies within his testimony and between his testimony and that of other witnesses.   For example, Bynum testified that he observed Nurse Hayes perform an EKG on Boley during his shift, although the record indicates that the only EKG performed occurred before Bynum arrived on duty.  *See* Tr. 1068:14–25; 1069:1–11.   Bynum also claimed that he personally entered B-wing, where Boley lived, to check on him, but Bynum's own co-defendant, Officer Guy, testified that the alleged visit was not noted in the logbook per their practice.  Tr. 1093:4–12.   And as mentioned before, Bynum's claim that Boley called his brother from the watch office is weakened by the jointly stipulated fact that calls from the watch office are not recorded, yet a recording of the aforementioned call exists.  Tr. 1047:1–1048:3.  It is not for the court to say whether these inconsistencies are due to lapses in memory, differences in interpretations, or naked untruths, whether by Bynum or others.  However, given the existence of these inconsistencies, there is little "clear" about the weight of the evidence as it relates to Defendant.   Therefore, because the evidence did not preponderate so heavily against the jury's verdict as to lead to a miscarriage of justice, the Court declines to grant a new trial on this basis.

### b. Timing Limitations Imposed by the Court[2]

Federal Rule of Evidence 611(a) provides that the Court "should exercise reasonable control over the mode . . . of examining witnesses and presenting evidence so as to (1) make those

---

[2] In a lengthy footnote contained in the Memorandum in Support for their separate Motion for A New Trial, Defendants Armor and Peck adopt Defendant Bynum's arguments that (1) the time limits imposed by the court and (2) the statements of Plaintiff's counsel each constitute grounds for a new trial.  (*See* ECF No. 200 n 10.)  Because the Armor Defendants do not elaborate on their arguments on these grounds outside of the footnote, the Court considers their arguments in tandem with its analysis of Defendant Bynum's arguments.

procedures effective for determining the truth [and] (2) avoid wasting time . . . ."  *See U.S. v. Fields*, 614 Fed. App'x. 101, 103 (4th Cir. 2015).  It is well settled that a trial court has broad discretion to "control the mode of interrogation of witnesses," including imposing time limitations of the questioning of witnesses.  *Id.*; *see also U.S. v. Midgett*, 488 F.3d 288, 299–300 (4th Cir. 2007) (finding in a criminal trial that the trial judge did not abuse their discretion by limiting defense counsel's direct examination of the defendant and his cross-examination of defendant's co-conspirator); *U.S. v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006) ("Trial judges are . . . entirely within their right to keep trial proceedings moving, and, if necessary, to ask counsel to pick up the pace.").  "A district court can impose reasonable restrictions on a defendant's ability to present relevant evidence so long as their restrictions are not arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (quoting *United States v. Woods*, 710 F.3d 195, 2000 (4th Cir. 2013)) (internal quotations omitted).  However, reviewing courts disfavor time limits that are set, managed, or revoked in an arbitrary or inflexible manner.  *See Raynor v. G4S Secure Solutions (USA), Inc.*, 805 Fed. App'x. 170, 177 (4th Cir. 2020).

In *Raynor v. G4S Secure Solutions (USA), Inc.*, Defendant G4S Secure Solutions argued on appeal that the district court unfairly granted Plaintiff time to present its case over and above the court's previously prescribed limits.  805 Fed. App'x. at 178.  The Fourth Circuit rejected this argument, finding that the defendant failed to present any "persuasive evidence that it would have benefitted from more time" and pointing out the defendant did not exhaust the time that it was given.  *Id.*  In the same case, Plaintiff Raynor argued that the district court did not go far enough, claiming that it should have granted even more time than the Court's predetermined 7.5-hour limit on testimony.  *Id.* at 178–79.  Determining that Plaintiff neither used his time strategically nor objected to the limitations, the Fourth Circuit similarly rejected this argument.  *Id.*

18

Like in *Raynor*, Defendant Bynum failed to object to the Court's imposition of time limits during the trial, and he has not persuasively shown that additional time would have benefitted his presentation of evidence to the jury.  On the third day of the five-day trial, this Court articulated the need for the trial to conclude within the number of days allotted and agreed upon by all parties. *See* Tr. 542–46.  Specifically, the Court asked Plaintiff's counsel, in light of the slower pace of its case about its plan to finish questioning all remaining witnesses and rest his case by the end of that day. *Id*. 543:19–20.  When Plaintiff's counsel responded that he might have an additional witness the following day, the Court informed him, "You're going to finish today." *Id*. 543:2–4.  After speaking with Plaintiff's counsel and counsel for Defendant Bynum's co-defendants, the Court asked Defendant Bynum's counsel about the witnesses he planned to call.  Counsel responded that he only planned to call Bynum and co-defendant Guy. *Id*. 545: 5–6.  The Court then imposed the aforementioned time limits on all parties for the remainder of the trial. *Id*. 545:17–546:1. When asked if they had any questions regarding the new timing parameters, Defense counsel replied that they did not. *Id*. 546:14–19.  At no point did counsel for Bynum object to the court-imposed time limits or request that they be modified.

The Court imposed its now-challenged time limits more than a day before Defendant Bynum presented his case-in-chief, while also emphasizing that the Court was open to reasonable flexibility in these guidelines upon request of the parties.  Aware of these timelines, and levying no complaints about them prior to beginning questioning, counsel for Bynum chose to place questions about the contents of an incident report authored by Bynum at the end of his allotted time, although he claims the report was important to his case.  However, the report merely reiterated the hours of Bynum's shift and restated that he spoke with Michael and James Boley on the phone that evening—both facts that had emerged in earlier testimony.  *See* Tr. 1057: 18–22.

Defense counsel then moved on, using the remainder of his time to ask questions about correctional officers sleeping on shift and the ability of prison personnel to get medical attention for inmates during the night hours.  Tr. 1058:9–1059:14.  Counsel did not request additional time for his direct examination.

If Bynum's report was "central to the heart of the case" as counsel claims, counsel did not choose to maximize his time exploring it.  (*See* Bynum Mem. Supp. JMOL 17.)  Nonetheless, the essential claim that Bynum did not know of Boley's worsening symptoms had already been presented to the jury numerous times, specifically through Bynum's claim that a nurse informed him that Boley was fine, through his claim that he spoke directly to Boley, and through his testimony that Boley appeared physically stable.  Additional testimony concerning the report would likely be superfluous or cumulative.  Most harmful to Defendant's argument is the fact that counsel did not exhaust his allotted time to counter Plaintiff's narrative or reemphasize arguments during his redirect of Bynum.  Instead, Defense counsel asked only three short questions and received three short responses in return, none of which directly furthered Defendant's claim that Bynum was unaware of Boley's worsening medical state.

Defendant further claims that the "questioning [of Bynum] was rushed."  (Bynum Mem. Supp. JMOL 17.)  Even if this was so, it applied equally to Plaintiff's cross-examination of Bynum.  The Court did twice provide time warnings to Bynum's counsel that included the words "wrap up" (*see* Tr. 1056:17–18; 1058:23–24); however, it levied the same or similar warnings to Plaintiff's counsel at least once during Plaintiff's redirect of Bynum, and at least six additional times while Plaintiff's counsel was speaking.  It is true that Plaintiff had more time to question his witnesses, but Plaintiff bore the burden of proof and persuasion on each of his counts.  Given Defendant's choice not to object to or question the time limitations, the comparative time for preparation for

20

the limitations (a full day versus plaintiff's need for immediate adjustment), the ability of Defendant to make effective arguments within the allotted time, and the choice not to exhaust his time when and where he had more available, the Court holds that its imposition of time limitations was not arbitrary or inflexible and thus does not necessitate a new trial.

### c. Improper Statements by Plaintiff's Counsel

Defendant Bynum contends that "several statements by Plaintiff's counsel during his rebuttal closing argument were improper sympathy appeals, not based on the evidence presented at trial, and calculated to inflame the jury . . . ." (Bynum Mem. Supp. JMOL 19.)  These statements included Plaintiff's counsel's reference to a mission to trip to the continent of Africa, his comparison of the medical care at Deerfield Men's Work Center to that of a "Third World Country," and references to his own mother's death and interactions with prior clients in wrongful death cases.  Despite pointing out these statements as improper in the present motion, no defendant objected to these statements during the trial or requested a curative instruction.

A key tenet of a fair trial is "a jury capable and willing to decide the case solely on the evidence before it."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). During closing argument, an attorney must confine comments to evidence in the record and to reasonable inferences from that evidence.  *Gilster v. Primebank*, 747 F.3d 1007, 1011 (8th Cir. 2014); *see also Tashjian v. Boston & Me. R.R.*, 80 F.2d 320, 321 (1st Cir. 1935) (stating that a closing argument must be a fair presentation of the party's claims from its point of view, must be confined to the evidence, and must not unfairly appeal to passion or prejudice).  However, "[i]t is the universal rule that during closing argument counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."  *Dennis v. General Elec. Corp.*, 762 F.2d

365, 366–67 (4th Cir. 1985) (internal quotations omitted).  The court will overlook a failure to object only if the error is so obvious or serious that the reputation and integrity of the judicial proceeding is impaired.  *Ray v. Allregan, Inc.*, 863 F. Supp. 2d 552, 566 (E.D. Va. 2012).  "A new trial is required on the basis of attorney misconduct only when a miscarriage of justice would otherwise result."  *Prichard*, 22 Fed. App'x. at 125.

The question of the propriety of certain statements in Plaintiff's closing argument is a close one.  In *Gilster v. Primeback*, for example, the Eighth Circuit found that counsel for the plaintiff in a sexual harassment suit improperly influenced the jury when she discussed her own experiences as a victim of harassment in order to emphasize the credibility of her client's claims.  747 F.3d at 1010.  Counsel in *Gilster* also referred to the experiences of some of her previous clients, which the district court also found to be improper.  *Id*. at 1012.  Here, while Plaintiff's counsel never claimed to be a victim of gross negligence or deliberate indifference, he did inject the conclusion of his argument with multiple personal anecdotes and opinions.  And although his mention of a prior client's wrongful death case was posited as an example of how the loss of a loved one can incur long-term damages, the wording of Plaintiff's closing is close enough to the objectionable statements made in *Gilster* to give the Court pause.

Despite this, these statements are not so egregious as to absolve Defendant Bynum of his obligation to object to them before the verdict.  Plaintiff's counsel explicitly stated that he was *not* seeking sympathy, but rather accountability.  Tr. 1168:3–6.  A reasonable person could also view his reference to an earlier wrongful death client as more analogy than appeal to passion, presented to counteract comments by Defendants' counsel that sought to diminish the element of the beneficiaries' sorrow in the calculation of damages.  *See, e.g.*, Tr. 1188:6–10.

Even if Defendant Bynum is correct that Plaintiff's counsel made improper statements so outrageous as to eliminate the need to object, the Court finds that the impropriety of those comments did not poison the proceeding such that a new trial is needed.  In *Mosser v. Fruehauf Corp.*, the appellate court determined that Plaintiff's counsel improperly incited the jury when he implored it to "let them know that [Defendant] can't kill a man like that in the Ohio Valley and not pay for it."  940 F.2d 77, 82 (4th Cir. 1991).  Despite these comments, the appellate court found that the trial court's calming instruction asking the jury to set aside impermissible influence of "sympathy or prejudice or bias for or against any party" was sufficient to avoid a mistrial.  *Id.* at 83.  In the present case, this Court issued a similar instruction not once but twice.  Prior to the parties' closing statements, the Court instructed the jury from the bench, saving only one instruction until after the conclusion of closing arguments.  The very first instruction read:

> You must perform your duties as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

Jury Instruction No. 1.  Immediately following the conclusion of Plaintiff's rebuttal closing, the Court read the jury a final instruction, stating in part:

> Remember at all times that you are not partisans.  You are judges— judges of the facts of this case.  Your sole interest is to seek the truth from the evidence received during the trial.  You must not base your verdict in any way upon sympathy, bias, guesswork, or speculation. Your verdict must be based solely upon the evidence received in the case and these instructions.

Jury Instruction No. 40.  Plaintiff's counsel's controversial statements were mitigated by the Court's decision to use its first and last instructions to the jury to remind them to base their verdicts on reason rather than passion.  The continued capacity of the jury to act free from bias is borne out

in the fact that the jury found Guy and Harris not liable on any counts, and found neither Bynum nor Peck liable on the count of deliberate indifference. *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir. 2001) (finding that a court can infer from a partial verdict in favor of a non-prevailing party that the jury was not swayed by passion or prejudice).

Considering Defendant's failure to object to Plaintiff's statements and the Court's mitigating instructions, the Court does not find that the presence of improper statements is a basis to grant a new trial as to liability in this case.

### 3. Remittitur

In support of his request for remittitur, Defendant Bynum argues that the jury award of $4 million was excessive because it falls under the single category of non-economic damages, and because the loss of a sibling is of a lower magnitude than the loss of a spouse, child, or parent. (Bynum Mem. Supp. JMOL 23.)  Defendant points to similar cases where Courts granted remittitur or juries awarded substantially lower damages. *Id*.

The Court recognizes that the jury award of $4,000,000 is substantial but declines to find that the award is so excessive as to shock the conscious of the Court.  The Court is sensitive to Defendant's genuine belief that, generally, the loss of a sibling is less distressing than the loss of a spouse, child, or parent.  However, this is merely a generalized assumption.  Plaintiff described, both in his brief and in trial, the close relationship shared by brothers Robert, Michael, and James Boley.  Their relationship was, arguably, even closer than the typical relationship between siblings, as the men had plans to live together in a family home after Robert's release from prison.  (Mem. Opp'n. JMOL Bynum 13–14.)  The jury also heard that Robert Boley, after serving the majority of a lengthy prison sentence, was likely months away from his release.  His future plans included not only career aspirations, but unlimited and unsupervised time with his family—a luxury that

24

the family was unable to experience for decades.  Michael and James spoke about anticipation of a togetherness that was, until recently, elusive.  Boley's unexpected death while in the very institution standing between the brothers and their plans plausibly elevated their grief, mental anguish, and sense of lost companionship.  The Court does not wish to invade the province of the jury by prescribing the ways that a jury should evaluate the subjective nature of relationships between family members.

As explained in the portion of this opinion discussing the appropriateness of Plaintiff's statements during closing argument, any improper statements that may have been made were not so severe or so effective as to render the jury unable to fairly and impartially render a verdict as to damages.  A jury is entitled to, and indeed should, assess that the compensatory value of a human life extends beyond earning potential and funeral costs of the deceased.  Damages may include non-pecuniary losses, including loss of companionship and support.  *See* Va. Code § 8.01-52 (listing categories of damages).  Given the information presented during trial, the instructions regarding damages read to the jury, and the evidence that the jury made a reasoned decision rather than one inflamed by passion, the Court cannot find that Defendant Bynum has met the heavy burden of showing the need for remittitur.  As such, the Court denies Defendant Bynum's Motion for a New Trial or Remittitur.

### 4. Benefit of the Settlement Set-Off

Under Virginia Code § 8.01-35.1, the amount recovered against one tortfeasor shall be reduced by the amount paid in settlement by another tortfeasor.  On January 3, 2023, this Court issued a Memorandum Order granting Defendants Armor and Peck's Oral Motion to Reduce Damages by $250,000, the settlement figure paid by then-defendant NurseSpring.  (See ECF No.

171.) Defendant Bynum emphasizes that he too should receive the benefit of the settlement set-off.

The Court clarifies that Defendant Bynum is also entitled to the settlement set-off of $250,000. In the present case, the Defendants are jointly and severally liable to the Plaintiff for damages. Thus, Plaintiff's possible recovery has been reduced to $3,750,000, regardless of the party or parties from which Plaintiff ultimately collects.

## B. Defendant Peck

### 1. Judgment as a Matter of Law

Defendant Nurse Peck appears not to contest the jury's implicit finding that she breached the standard of care for a nurse when she failed to immediately evaluate and care for Boley. Instead, Peck seeks judgment as a matter of law because "Plaintiff failed to present any evidence that Nurse Peck's alleged breach of the standard of care was a proximate cause of Boley's death." (Armor Mem. Supp. JMOL 11–12, ECF No. 200.)

Peck and Armor correctly state that to prevail on a claim for negligence or gross negligence, a plaintiff must establish the applicable standard of care, that the defendant violated that standard, and that that breach was the proximate cause of the injury claimed. *Dixon v. Sublett*, 809 S.E.2d 617, 620 (Va. 2018); *accord Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). In a medical malpractice action, the plaintiff must show that a course of action the defendant should have pursued would have changed the outcome for the injured party. *Fruiterman v. Granata*, 668 S.E.2d 127, 133 (Va. 2008); *see also Dixon*, 809 S.E.2d at 620. However, a single event can have more than one proximate case. *Jenkins v. Payne*, 465 S.E.2d 795, 799 (Va. 1996). To relieve a defendant of liability for negligence when multiple parties act negligently a single chain of events, "the negligence intervening between the defendant's negligent

act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury." *Id.*; *see also Panousos v. Allen*, 425 S.E.2d 496, 499 (1993).

Before turning to the substantive basis for a renewed motion for judgment as a matter of law, a court should examine whether the renewed motion has been properly raised. As discussed in an earlier section of this opinion, a Rule 50(b) motion is a renewal of a motion made pursuant to Rule 50(a) and must be based upon the particular grounds raised at the close of evidence in the party's Rule 50(a) motion. *See Smith*, 632 F.2d at 338–39; *see also Tidewater Finance Co., Inc.*, 4 Fed. App'x. at 204.

Here, counsel for Nurse Peck did make an oral Rule 50(a) motion following the conclusion of Plaintiff's case-in-chief, but now raises its Rule 50(b) motion on different and additional grounds. During Nurse Peck's original motion, counsel argued (1) that Plaintiff failed to present evidence that Nurse Peck knew of Boley's condition and (2) that Plaintiff's causation expert only assumed which tests and assessments would have been run, should Boley have received proper medical care at a hospital. Tr. 854:5–855:8. Both of these arguments are distinct from those that counsel for Nurse Peck makes in the recently filed Rule 50(b) briefs. Now, Nurse Peck's attorneys argue that Plaintiff's outcomes would have remained the same even if Peck had complied with the standard of care. In doing so, the Defendant introduces for the first time a different and much more extensive causation argument tied to case law from the Commonwealth of Virginia. Because this was not the basis for Nurse Peck's counsel's original Rule 50(a) motion, the Court cannot now consider the substance of Defendant's new arguments.

In the original motion for judgment as a matter of law, counsel for the Armor Defendants focused the lion's share of their argument on Dr. Harris. When turning to Nurse Peck, defense

counsel explained that he "make[s] the same motion [i.e., judgment as a matter of law] with respect to those two heightened claims," those claims being gross negligence and deliberate indifference under §1983 (Counts II and IV).  Tr. 852:19–20.  Notably, they did not seek judgment as a matter of law for Plaintiff's simple negligence claim (Count 1), and so the Court cannot not take up any additional motions for judgment pertaining to Count 1 at this renewed-motion stage.  As to arguments related to Count II, gross negligence, Defendant's counsel discussed causation during his Rule 50(a) motion when he stated:

> Dr. Kundi is the causation expert.  Dr. Bethea said on the stand . . . that these were decisions for the vascular surgeon and what was going to happen and what was going to be performed and if he was going to survive.  That's all within the vascular surgeon.
>
> The vascular surgeon offered expert testimony on it, but he was clear on cross that he was assuming a number of things about the actions of other healthcare providers . . . .  [H]e's making an assumption about what tests would have been run, what assessments would have been made by those independent providers who aren't here, and we don't know who they would be even.

Tr. 854: 6–23.  While the above statements do argue that lack of certainty about the nature of the emergency care frustrates Plaintiff's causation arguments, Defendants never directly made the argument that Dr. Harris's actions broke the chain between Nurse Peck's negligence and Robert Boley's death, never directly argued that Nurse Peck's negligent acts would not have changed the outcome for Boley, and did not argue that plaintiff's medical causation experts did not apply to the actions of Nurse Peck.

And while counsel for Nurse Pack did argue during trial that Plaintiff's counsel failed to adequately and definitively describe the nature of the treatment Boley would have received at the hospital, and therefore the Court can consider Defendant's renewed motion on this ground afresh, the Court is not persuaded that there was in fact such a failure.  Affording Plaintiff the benefit of

28

all possible inferences, as is appropriate at the Rule 50 stage, *see Galloway v. U.S.*, 319 U.S. 372, 395 (1943), a reasonable jury could infer from the events of the day that if Nurse Peck would have properly cared for Boley, he would have been immediately evaluated and referred for appropriate medical care.  Plaintiff presented evidence about what such subsequent care would involve.

Specifically, Dr. Bethea claimed that "[w]ith 100 percent medical probability, a CAT scan would have been obtained" at the hospital, which "would have shown an aneurysm, and it would have shown extravasation of blood, which means leakage."  Tr. 642:8–10, 13–16.  Dr. Kundi later testified that a treating physician at a hospital would typically evaluate Boley with a physical exam, an EKG, a chest x-ray, and laboratory studies.  Tr. 696:21–697:1.  These studies, particularly the x-ray, would have revealed the burst aneurysm and the blood accumulating in the left chest, and shown increased lactate in his blood, indicating a body under undue stress like a hemorrhage.  Tr. 697:4–14.  Dr. Kundi also testified that "the surgery that [Boley] needed is widely available, it's minimally invasive and it's rapid."  Tr. 693:22–25.  He continued, "We don't need to cut people open at all for this anymore.  Using wires and stents and catheters, we can simply puncture the femoral artery at the hip and run an endograft, which is made of fabric that is also married to an expandable, self-expanding stent and put it over the area of leakage and deploy it doing the same surgery, without having to open the chest, without putting him on bypass, without needing cardiac surgery there."  Tr. 694:10–18.

The Court perceives these facts to be sufficiently specific to persuade the jury that Boley would have received lifesaving treatment in a hospital setting.  Defendant's apparent demand that Plaintiff's expert articulate granular details regarding the personnel and inner workings of the closest possible hospital to Deerfield are excessive and are further undermined by Dr. Kundi's testimony that helicopter service exists specifically for circumstances where a rural hospital is

underequipped for whatever reason.  Tr. 715:10–17.  It is neither possible nor reasonable to ask an expert witness to peer inside the resumes and records of every provider at any given hospital and articulate with absolute certainty that a specific outcome would occur.  Instead, an expert witness must testify with a reasonable degree of medical certainty that a reasonable doctor would have taken a particular course of action.  Here, Plaintiff offered testimony that satisfied that standard.  As a result, the Court holds that Defendant has not met its burden to show that a reasonable jury could only find that Nurse Peck was not liable on Counts I and II, and therefore the Court will deny the Armor Defendants' Renewed Motion for Judgment as a Matter of Law.

### 2. New Trial

Defendant Peck asserts that the jury was likely swayed by improper character evidence presented during the trial.  On the second day of trial, Plaintiff's counsel attempted to introduce propensity evidence through the testimony of witness Carlo Wilson.  Defendants objected in each of those instances and the Court sustained those objections.  *See* Tr. 417:12–420:6. After sustaining several objections by counsel for Nurse Peck, the Court directed counsel to put on their headsets for a bench conference out of the jury's hearing.  Tr. 420:5–6.  After discussion with all counsel at the bench conference, the Court sustained yet another defense counsel objection and recommended questioning of Wilson.  Plaintiff proceeded to attempt to question Wilson, but counsel for both Defendant Bynum and Defendant Peck objected throughout, based on inappropriate propensity evidence, leading questions, and relevance.  The Court sustained the bulk of those objections.  Tr. 425:15–432:24.  Ultimately, Wilson's admitted testimony was innocuous, stating that inmates seeking medical attention must submit medical slips at night or very early in the morning prior to the arrival of Nurse Peck, which makes seeking immediate help difficult for inmates.  Tr. 426:16–427:5.

On the third day of trial, witness Marese Francis opined that Peck "didn't really act like she cared about nothing.  No one—I mean, she wasn't—I didn't understand how someone could be—for me, my personal about her, I think she just didn't care.  It was about her just coming to work and leaving." Tr. 724:25–725:4.  At the close of Francis's testimony, counsel for Nurse Peck asked to make a motion, and the Court heard that motion outside of the presence of the jury.  Tr. 740:4–8.  Counsel then moved to strike the testimony about Nurse Peck's reputation under Federal Rule of Evidence 404(a).  Tr. 740:4–747:12.  After prolonged discussion, the Court decided to strike the testimony because "the only logical reason I can see that this testimony came out about her reputation would be to show that [Nurse Peck] acted in conformity therewith on April 16." Tr. 747:7–9.  The Court then informed all counsel that it would instruct the jury to disregard testimony about Peck's reputation for callously or dismissively towards inmates.  No parties had further objections to the Court's ruling.  Tr. 747:18–21.  When the jury returned to the courtroom, the Court instructed:

> So after further review, I've concluded that any testimony that was elicited from this witness regarding any evidence about Nurse Peck's reputation should just be disregarded by you. So don't take that into consideration in any way when you're considering this case and get to the stage of deliberation or in evaluating the other evidence that may come in during the plaintiff's trial.

Tr. 748:1016.  Defendants did not object to this instruction as insufficiently curative, and the trial resumed accordingly.

The Court agrees with Plaintiff that the nature of the comments heard by the jury were not so prejudicial as to make the Court's curative instruction insufficient.  Juries are presumed to follow curative instructions given to them by the Court unless there is an overwhelming probability that the jury will be unable to follow those instructions and a strong likelihood that the effect of the evidence will be devastating to the defendant. *United States v. Gordon*, 754 Fed. App'x. 171,

178 (4th Cir. 2018).  *See also Nichols*, 251 F.3d at 501 ("For, while it may not always be simple for the members of the jury to obey a curative instruction, there is an almost invariable assumption of the law that jurors follow their instructions . . . .") (internal citations and quotations omitted).

Defendants offer little reason—outside of what it perceives as a "lack of causation evidence"—to believe that the jury ignored the curative instruction or was otherwise confused in a way that prejudiced Nurse Peck.  Although they claim that the jury's finding of no liability for codefendant Dr. Harris indicates the finding of liability for Nurse Peck was the product of improper consideration of character evidence, they do not address the fact that the jury could have reasonably assessed that Dr. Harris's behavior met the applicable standard of care while Nurse Peck's did not.  In this case, Dr. Harris did interact with Boley, ordering an EKG, discussing vitals with a nurse, prescribing him medicine, and setting an appointment for the next day.  In contrast, the factual allegation against Nurse Peck was that she encountered Boley, heard him request aid, and in turn refused to render it.  To bolster this narrative, Plaintiff presented convincing evidence beyond the character-related testimonies of Wilson and Francis, including witnesses who observed Boley speaking to Peck and time records showing that Peck was the only nurse known to be in the Men's Work Center on April 16, 2019.

The mere fact that the jury found for the Plaintiff is not evidence that the jury must have considered the character evidence stricken by the Court.  On this basis, therefore, the Court will deny the Armor Defendants' alternative Motion for a New Trial.

## C. Defendants Armor and Peck's Motion to Alter, Amend, or Correct Judgment

The Armor Defendants ask the Court to issue an order altering, amending, or correcting its January 13, 2023 judgment order. (ECF No. 196.)  The Court will grant Defendants' Motion.  "Federal courts may issue *nunc pro tunc* orders, or now for then orders, to reflect the reality of

what has already occurred . . . ." *Roman Catholic Archdiocese of San Juan v. Feliciano*, 140 S. Ct. 696, 700–01 (2020) (internal quotations and citations omitted). Use of a *nunc pro tunc* order is limited to make the record reflect what the district court intended to do on an earlier date, but which it did not sufficiently express or did not accomplish due to some error or inadvertence. *United States v. Sumner*, 226 F.3d 1005, 1010 (9th Cir. 2000). Here, the Court incorrectly and inappropriately dated its Amended Judgment "January 13, 2023 *Nunc Pro Tunc*: December 9, 2022," although it was not the intention of the Court or any party to modify the jury's verdict declining to award prejudgment interest. The Court will issue a separate Order correcting its judgment to that effect.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendant Emmanuel Bynum's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial (ECF No. 182), deny Defendants Armor Correctional Health Services, Inc.'s and Nurse Arleathia Peck's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial (ECF No. 199), and grant Defendants Armor and Peck's Motion to Alter, Amend, or Correct Judgment (ECF No. 196).

Appropriate Orders shall issue.

_____
/s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: <u>April 5, 2023</u>